1

THE HONORABLE ROBERT S. LASNIK

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

MARVIN MANN,

No. 2:15-cv-01507 RSL

10

Plaintiff,

DEFENDANT BOEING'S OPPOSITION
TO PLAINTIFF'S SECOND MOTION FOR
CLASS CERTIFICATION

11

v.

12

THE BOEING COMPANY,

13

Defendant.

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT BOEING'S OPPOSITION TO
SECOND MOTION FOR CLASS
CERTIFICATION (No. 2:15-CV-01507 RSL)

03002-2602/92070406.8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS ................................................................................................................. 2

      A.    Procedural Posture ................................................................................... 2

      B.    Boeing's Operations.................................................................................. 3

            1.    The Everett Factory..................................................................... 3

            2.    The 777 Program........................................................................... 3

      C.    Mann's Class Definition .......................................................................... 4

      D.    Mann's New Proposed Class Contains a Diverse Population of Managers
            with Unique Assignments and Different Responsibilities ....................... 6

            1.    Mann's Proposed Class Includes Managers From Different MBUs
                  on Different Shifts Performing Fundamentally Different Duties ............. 7

                  a.    DAKU-Ks' Jobs Are Affected By Their Specific Statement
                        of Work ....................................................................... 7

                  b.    Differences Between Shifts........................................................ 8

                  c.    DAKU-Ks Have a Variety of Other Responsibilities................... 9

                  d.    Potential Class Members Perform Supervisory Duties
                        Differently................................................................ 10

      E.    Mann's Limited Experience in the 777 Program .................................. 11

III.  MOTION TO STRIKE ...................................................................................... 12

IV.   ARGUMENT ..................................................................................................... 13

      A.    Class Certification Standards ................................................................. 13

      B.    Mann Does Not Attempt to Meet His Class Certification Burden ...................... 13

      C.    Mann Has Failed to Propose An Identifiable Class ........................................... 14

      D.    Mann Cannot Establish Rule 23(a)(2) Commonality ......................................... 15

      E.    Individual Issues Predominate Over Any Common Issues Under Rule
            23(b)(3) ................................................................................................. 16

            1.    Washington's White Collar Exemptions Require a Fact-Intensive
                  Analysis........................................................................................... 16

                  a.    The Executive Exemption...................................................... 17

                  b.    The Administrative Exemption.................................................. 18

            2.    Individual Issues Predominate as to Whether a Given DAKU-K's
                  Primary Duty Was Managerial, Administrative, or a Combination
                  of the Two ..................................................................................... 18

            3.    Potential Class Members Have Different Duties and
                  Responsibilities.............................................................................. 19

            4.    Any Attempted "Common Policy" Argument Would Fail..................... 22

**TABLE OF CONTENTS**
**(continued)**

Page

F.    Mann Also Cannot Establish Other Rule 23(a) Prerequisites.............................. 23

G.    A Class Action Is Not "Superior" ...................................................................... 23

V.    THE COURT SHOULD DENY MANN'S SECOND MOTION WITH
       PREJUDICE ......................................................................................................... 24

VI.   CONCLUSION...................................................................................................... 24

1

## I.       INTRODUCTION

Plaintiff Marvin Mann's first motion for class certification failed the threshold requirement of commonality. Put simply, Mann's class definition was way too broad. As the Court explained in denying Mann's first motion, the "proposed class consists of all Level K managers across several different operations with a wide variety of responsibilities. Even just among DAKU-Ks there are managers with fundamentally different duties from those described by plaintiff." Dkt. #49 at 4. Recognizing that he could not propose a new class of all DAKU-Ks, Mann's "renewed" motion for class certification instead presents a byzantine new definition, subject to an even more confusing set of exclusions. And what is worse, Mann's perfunctory, two-page motion fails to offer any specific evidence or argument in support of certification of the "revised" definition; he just "incorporates" his first motion "by reference." Mot. at 1-2. "Judges are not like pigs, hunting for truffles buried in briefs" or the record, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and the Court should not be left to sniff out the reasons that the revised class is certifiable. Nor is it fair to make Boeing shadowbox—it must guess how Mann thinks his earlier motion papers about a different class "apply to his revised class definition" and then rebut those phantom arguments. Mot. at 2. Vague references to a motion the Court *denied* do not establish that the Court should *grant* this motion.

In any event, the current motion fails a Rule 23 analysis. First, Mann has not proposed a workable class definition. By trying to gerrymander the proposed class to exclude some presumed members on an ad hoc basis, Mann offers a definition that would require the factfinder to conduct a detailed factual investigation to determine who is even potentially a class member. This defect forecloses the class bid at the outset. Second, Mann cannot establish (a) the Rule 23(a) prerequisites or (b) predominance and superiority per Rule 23(b)(3). This motion has the same fatal flaw as Mann's first—his proposed class sweeps in managers performing different assignments in different ways that would drive and determine the exemption analysis. Indeed, there remains no common issue as to which exemptions apply.

Given all this, there is no possibility that the time-consuming exercise of trying Mann's individual case would or could dispose of anyone else's misclassification claim. The declarations supplied by Boeing with this opposition once again reveal widespread variation and that a class trial would be an unmanageable aggregation of not-so-mini individual proceedings. Common issues subject to common answers do not exist, much less predominate, and Mann offers no trial plan that would solve this intractable problem. His motion should be denied.

## II.     FACTS

### A.     Procedural Posture

On April 14, 2016, Mann moved to certify a class of "First Line Leaders (FLLs) (Level K) in the Manufacturing and Production Department of the 777 Program" in Washington since September 22, 2012. Dkt. #26 at 4 (the "First Motion").[1] The motion was supported only by Mann's own declaration and an attorney declaration attaching a handful of documents. In opposition, Boeing provided extensive testimony from putative class members and other witnesses. Dkt. ##34-40. In Reply, Mann responded by asking the Court to construe his proposed definition to exclude individuals falling within it (Dkt. #44 at 7-8) or redefine the class, *id.* at 12.

Focusing its analysis on "the class definition for which plaintiff actually sought certification," Dkt. #49, the Court denied Mann's First Motion. The Court noted that job duties of putative class members varied widely both across different jobs and "[e]ven just among DAKU-K's." Dkt. #49 at 4. Accordingly, Mann could not establish commonality because there was no common question whose common answer could drive resolution of the case. *See id.* at 4-5. While the Court denied the motion, it gave Mann a chance to present a renewed motion that "more precisely reflects" the "intended scope" of the class Mann sought to represent, but warned that such a motion would "be subject to a new Rule 23 analysis." *Id.* at 5.

Mann responded by filing a cursory, two-page "renewed" motion that contains no additional Rule 23 analysis. Indeed, it (a) purports to "incorporate[] by reference" earlier

---

[1] Boeing alerted Mann to problems with this definition months before he filed the First Motion, but he clung to it. *See* Dkt. #47 ¶¶ 2-5.

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 2
03002-2602/92070406.8

1   arguments in favor of a *different* class and (b) highlights Mann's lack of confidence in his

2   revised definition by suggesting the Court should give him yet *another* opportunity to propose

3   yet another a class definition if "confusion and complexities continue." Mot. at 2.

4   **B.     Boeing's Operations**

5   **1.      The Everett Factory**

6   This case concerns how Boeing builds one of the world's leading commercial airplanes,

7   the 777, at a plant in Everett, Washington. Most of this work occurs inside the massive Everett

8   "Factory," which encloses 500 million cubic feet and stretches over almost 100 acres. Second

9   Declaration of Peter Johnson ("2nd Johnson Decl.") ¶ 3 & Ex. A. Boeing's four largest airplane

10  models (the 747, 767, 777, and 787) are assembled inside the Factory, which operates around the

11  clock. *Id.* More than 6,000 hourly production workers work in the Factory on 1st shift alone. *Id.*

12  **2.      The 777 Program**

13  The organization that builds current model 777s in the Factory is known as "777

14  Operations." *Id.* ¶ 2. 777 Operations has three Manufacturing Business Units ("MBUs"), each

15  with its own director, which are responsible for different parts of the build. Construction begins

16  in back shops where crews build up the structures that create the plane's fuselage and wings. *Id.*

17  ¶ 6. This work is done by the two "Structures" MBUs ("Wings" and "Fuselage"). *Id.* These

18  airplane structures are then transported to a different part of the Factory for painting and

19  processing, then returned to the Factory floor for work done by the "Final Assembly" MBU,

20  which occurs as the plane travels down the moving line through a series of work areas along the

21  Factory floor. *Id.* Thousands of hourly production employees on three shifts attach the wings to

22  the fuselage and join fuselage sections to form the airplane body; install and test engines, landing

23  gear, emergency exits, and flight control systems; install electronics, avionics, and interior

24  elements; and perform thousands of other jobs to complete the airplane. Each plane is unique, as

25  several models are built on the same line and some elements are customized for each airline

26  customer. *Id.*

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 3
03002-2602/92070406.8

1    This production process is carefully planned and sequenced, but the Factory does not run

2    like clockwork. Boeing relies on skilled first-line managers precisely because problems arise

3    constantly, at every step, and serious bottlenecks can shut down the line. The thousands of hourly

4    employees who perform the hands-on production work have responsibility only for their own

5    assigned tasks. It is not their problem if half their crew fails to report to work, if a supplier

6    delivers a defective part, or if a job takes three times its scheduled time. Instead, it is the first-line

7    manager's job to anticipate and resolve these and countless other problems that can affect

8    production. The system would collapse without constant and careful monitoring, coordination,

9    and intervention by first-line managers up and down the line. *Id.* ¶ 14.

10   Further, Boeing regularly refines the 777 production process—akin to building a railroad

11   while the train barrels down the tracks. DAKU-Ks play a key role in identifying opportunities

12   for, planning, and implementing these changes. *Id.* ¶ 15. That said, as further discussed below,

13   some DAKU-Ks play a bigger role in these process improvements than others.

14   **C.    Mann's Class Definition**

15   Mann now proposes a two-part class definition:

16        1.   Boeing Job DAKU-K employees at its Everett facility directly supervising
             IAM members engaged directly in the assembly of 777 (but not the 777X)
17           aircraft in the Everett factory,

         2.   excluding employees whose principal supervisory responsibilities were
18           related to training, tooling, staffing, quality control or who held Boeing
             Production System positions or other positions involving cross operational
19           initiatives including Tactical Manager positions.

20   Mot. at 2. Some parts of the definition are clear, but Boeing cannot ascertain the putative class

21   population with any specificity. It encompasses Everett-based first level ("Level K") managers in

22   the DAKU (Manufacturing Manager) job family and is limited to those supervising IAM-

23   represented employees involved in the "assembly" of 777 aircraft.[2] 2nd Declaration of Sheila

24   Sagisi ("2nd Sagisi Decl.") ¶¶ 3-4; 2nd Declaration of Jane Sykes ("2nd Sykes Decl.") ¶ 7. So

25

26        [2] The IAM is the union representing Boeing's production and maintenance workers. 2nd Declaration of
     Yvonne Marx ("2nd Marx Decl.") ¶ 4.

far, so good. But the definition attempts to *exclude* many DAKU-Ks otherwise falling within it and uses subjective and ambiguous language to that end.

First, "*directly* supervising IAM members engaged *directly* in the *assembly* of 777" is ambiguous on each italicized term. Which DAKU-Ks "directly" supervise IAM members is not clear. Some run discrete departments, each with a specific statement of work and assigned crew. Second Sagisi Decl. ¶ 5. Others have had assignments where they did not supervise a specific crew, but *did* regularly supervise IAM employees (such as when another manager was on leave), or where they supervised IAM workers in *other* DAKU-Ks' crews on a *daily* basis. *Id.*; Schultz Decl. ¶ 5 (manages a crew comprised of mechanics pulled from other 777 crews).[3] These DAKU-Ks "supervise" IAM employees, but Mann's qualifier "directly" renders the applicability of the class definition unclear as to them. Next, what it means to be "engaged directly in the assembly of 777" aircraft is not clear because many IAM workers directly involved in building 777s do not engage "directly" in the "assembly" of 777 aircraft, such as painters, sealers, leads, functional test workers, and workers in "support cells" who troubleshoot production problems and facilitate solutions. 2nd Sagisi Decl. ¶ 10; 2nd Johnson Decl. ¶ 12; 2nd Chen Decl. ¶¶ 11-12.

Second, the exclusion of employees who had delineated "principal supervisory" responsibilities is even more ambiguous. 2nd Sagisi Decl. ¶ 5. All DAKU-Ks wear multiple hats, in varying combinations and to different degrees, and many are responsible for significant responsibilities beyond supervising an IAM crew. *Id.* ¶ 6.[4] Determining their "principal" responsibility is no easy task and would require individualized inquiry and arbitrary distinctions based on subjective standards to determine which of several responsibilities takes primacy.

Third, Mann attempts to exclude DAKU-Ks in the "position" of "Boeing Production System" ("BPS") or "Tactical Manager," but there *is* no such "position." 2nd Sagisi Decl. ¶ 6; 2nd Sykes Decl. ¶ 11. These terms have been used historically to refer to responsibility for

---

[3] Declarations of potential class members are gathered in the Compendium filed with this brief, and organized alphabetically by last name. Declarations of other Boeing witnesses are filed as separate documents.

[4] *See also* 2nd Johnson Decl. ¶¶ 13, 15; Allanson Decl. ¶ 2 (crew manager, staffing focal, tactical and quality manager and acting PCL); Oh Decl. ¶ 4 (crew manager and "staffing manager" for Wing Body Join).

running lean manufacturing initiatives, other projects, or serving generally as a second-level manager's "right hand." 2nd Sagisi Decl. ¶ 6. How these terms are used has varied. Some business units have designated a "Tactical Manager" or "BPS Manager," who may or may not have an assigned IAM crew. *Id.*[5] In other cases, a DAKU-K might assume substantial additional responsibility in one or both of these areas without any formal designation. And *every* DAKU-K is expected to help coordinate between production areas and to contribute to efficiency initiatives to some degree. *Id.*; 2nd Johnson Decl. ¶ 13. Boeing has no master list identifying all persons performing tasks associated with "BPS Manager" or "Tactical Manager." 2nd Sagisi Decl. ¶ 6.

Finally, Boeing has no ready way to identify DAKU-Ks in "positions involving cross operational initiatives." The phrase "cross operational initiative" is not a term of art at Boeing and there is no list of "cross operational initiative" positions. *Id.* ¶ 8.

**D.    Mann's New Proposed Class Contains a Diverse Population of Managers with Unique Assignments and Different Responsibilities**

Because Boeing cannot identify precisely who would fall within (or be excluded from) the proposed class, it addresses the population that *can* be identified, namely, DAKU-Ks in 777 Operations who have supervised IAM production workers during the class period.

The job description for the DAKU-K position states:

> Manages employees . . . in multiple manufacturing disciplines. Develops and executes business plans, policies and procedures and develops organizational and technical strategies. Acquires resources, provides technical management of suppliers and leads process improvements. Develops and maintains relationships and partnerships with customers, stakeholders, peers, partners and direct reports. Provides oversight and approval of technical approaches, products and processes. Manages, develops and motivates employees.

2nd Sykes Decl., Ex. A. As this states, and as set out below, the DAKU-K job has many different responsibilities. There are some common facets. It is paid a fixed salary for all hours worked. *Id.* ¶ 12. Boeing's performance management and compensation systems are designed to evaluate and reward DAKU-Ks based on how well they manage. *Id.* ¶ 13; 2nd Eberhardt Decl. Ex. A (Mann

---

[5] S*ee also, e.g.*, 2nd Eberhardt Decl. Ex. A (Mann Dep. 32:14-33:8) (Mann's mentor when he was a temporary manager was a "full-time" manager of a crew of IAM workers who, as a senior first line supervisor, "kind of carried dual hats" and filled in for the second level manager in his absence).

Dep. 69:14-22; 95:12-96:9). Salaries vary widely. For example, in 2014, the salary range in Puget Sound was $87,000 to $145,000. 2nd Sykes Decl. ¶ 13. Salary increases are based on annual performance reviews, with increases heavily weighted to top performers. 2nd Sagasi Decl. ¶¶ 12-13. DAKU-Ks can also qualify for performance bonuses as measured against business goals and leadership attributes. 2nd Sykes Decl. ¶ 14. This compensation system is designed to encourage, reward, and reinforce management effectiveness and leadership. *Id.*

> 1. **Mann's Proposed Class Includes Managers From Different MBUs on Different Shifts Performing Fundamentally Different Duties**
>> a. **DAKU-Ks' Jobs Are Affected By Their Specific Statement of Work**

As explained above, 777 Operations is comprised of three MBUs, each of which is a large, complex business in its own right. 2nd Johnson Decl. ¶ 19. Each MBU has multiple "process centers," which in turn have multiple departments. *Id.* Each department has a unique statement of work and a dedicated crew of IAM employees and is managed by a single DAKU-K. *Id.*; 2nd Sagisi Decl. ¶ 15. There are marked differences between the complexity, rate, and scope of work done by different departments, as well as the size of these teams. In some, employees may perform the same well-defined work tasks day after day, but in others, employees have diverse assignments and DAKU-Ks must often change and reprioritize assignments to address customer demands. *E.g.*, 2nd Johnson Decl. ¶ 18.[6]

The two "Structures" MBUs are responsible for assembling, painting, and sealing the major structural assemblies in back shops before they are delivered to the Factory floor for final assembly on the moving line. *Id.* ¶¶ 6, 18. This work is generally more predictable, consistent, routine, and less likely to affect other business units when problems arise than work performed farther down the line. *Id.* By contrast, joining the massive wings to the center fuselage section and joining the fuselage sections to form the airplane body is difficult, critical, and can lead to costly line shutdowns when things go wrong. The result is that (generally speaking) Final Assembly DAKU-Ks must coordinate more closely to, for example, integrate "traveled" work

---

[6] *See also* 2nd Miller Decl. ¶ 16 (describing need to do "more management" where crew's work is varied).

that was not timely completed in a prior department, which complicates production by orders of magnitude. *See, e.g.*, 2nd Devries Decl. ¶ 12 (DAKU-Ks at the end of the line "must spend more time triaging problems, brainstorming and implementing solutions to their work statement").

The nature of the work done in different 777 production areas affects personnel issues. 2nd Sagisi Decl. ¶ 24. There are exceptions, but work done in the Structures MBUs is relatively unskilled, repetitive, and physically demanding. *Id.* This results in relatively high turnover (and thus more hiring, training, and monitoring of new employees) and performance problems. *Id.* By contrast, Final Assembly has more highly skilled and experienced employees who perform more varied and less physically demanding work, which contributes to a more stable workforce. *Id.* These differences contribute to substantial variation in the amount of discipline that DAKU-Ks impose. Some production areas in the Structures MBUs have discipline rates for IAM employees that are as much as four times as high as discipline rates in Final Assembly production areas. *Id.*

### b.    Differences Between Shifts

The Factory runs three distinct shifts. Most production work takes place on 1st shift (which starts between 5 and 5:30 a.m.), so 1st shift DAKU-Ks have more access to upper management and support organization personnel (such as Human Resources), virtually all of whom work 1st shift. 2nd Johnson Decl. ¶¶ 16-17.[7] Most planning work occurs on 1st shift, so 1st shift DAKU-Ks spend much of the day in management meetings. *Id.* ¶ 17.[8]

Second shift starts between 2-3 p.m. *Id.* ¶ 16. Given their work hours, 2nd shift DAKU-Ks have less access to upper management and support organizations. *Id.* ¶ 17. Senior IAM employees prefer 1st and 3rd shifts, so new hires are usually assigned to 2nd shift; consequently, 2nd shift accounts for a larger share of employee issues and discipline and requires closer management oversight of employees. 2nd Sagisi Decl. ¶ 13; 2nd Logan Decl. ¶¶ 6, 12-15 (describing need to focus on development, training and quality control given crew inexperience).

---

[7] *See, e.g.*, Berg Decl. ¶ 3 ("significant differences" between shifts; 1st shift managers have "a lot more responsibility and accountability" and are "the 'locomotive of the train' for all three shifts"); Schultz Decl. ¶ 12 ("limited HR resources" and access to senior managers on 3rd shift so he "must exercise independent judgment.").
[8] *See also* Schultz Decl. ¶ 15; 2nd Hake Decl. ¶ 3; McGill Decl. ¶¶ 4-5.

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 8

1   Notwithstanding the relative isolation of 2nd shift, DAKU-Ks with initiative have created

2   opportunities to advance their careers by leading process improvement projects.[9]

3    Third shift starts between 10-11 p.m. It is small (only 10% of total hourly population, or

4   less than 1/5 the size of 1st shift), and most production areas do not even have 3rd shift crews, so

5   there are few 3rd shift managers. 2nd Sagisi Decl. ¶ 13. This shift is short (only 6.5 hours) and

6   focuses on tasks that cannot be done when the Factory is busy. 2nd Johnson Decl. ¶ 16. Thus,

7   3rd shift DAKU-Ks spend relatively less time on the planning work that characterizes 1st shift in

8   particular. *Id.* ¶¶ 16-17. On the other hand, compared to DAKU-Ks on other shifts, 3rd shift

9   DAKU-Ks are on their own when it comes to day-to-day management. *Id.* ¶ 17.[10]

10    DAKU-Ks frequently move between shifts. Indeed, in some process centers, DAKU-Ks

11   rotate shifts every few months.[11] It is fairly uncommon for a DAKU-K to work entirely on third

12   shift, which was, as described below, true for Mann.

13      **c. DAKU-Ks Have a Variety of Other Responsibilities**

14    All DAKU-Ks are expected to look beyond daily production and crew management to

15   initiate and lead efforts to assess and improve production processes, safety, and efficiency. 2nd

16   Johnson Decl. ¶ 15. Some have notable responsibilities on top of supervising a crew.[12] Some are

17   heavily involved in hiring for the 777 program.[13] Others are responsible for leading an initiative

18   within a business unit, such as a "Safety Manager" or "Compliance" Manager.[14] Some have had

19   "BPS" or "Tactical" assignments.[15] A few have performed such duties more-or-less full time for

20   varying periods, but others do so as an additional responsibility while running an hourly crew.[16]

---

21    [9] 2nd Logan Decl. ¶¶ 6, 12-15 (2nd shift presents opportunities to take on leadership responsibilities).

22    [10] Hamblen Decl. ¶ 5 (describing "big differences between 2nd and 3rd shift"); 2nd Le Decl. ¶¶ 3-6 (she has found 3rd shift management most challenging because she had to resolve so many issues on her own).

23    [11] *See, e.g.*, Brenberger Decl. ¶ 5 (rotated shifts every three months); Dittberner Decl. ¶ 3 (same, every six months); *see also* 2nd Le Decl. ¶¶ 3-6 (has managed crews on all three shifts); McGill Decl. ¶¶ 4-5 (same).

24    [12] *See, e.g.*, Allanson Decl. ¶ 2 (Gemcor crew manager, staffing focal, quality and tactical manager, *and* an acting PCL on first shift); *see also* Appendix ("App.") B § 5. (Appendix B summarizes DAKU-Ks' testimony.)

25    [13] *See, e.g.*, 2nd Chen Decl. ¶ 16 (conducted interviews and made hiring decision); *see also* App. B § 1.

     [14] *See, e.g.*, Brenberger Decl. ¶¶ 15-16 (managed crew while reviewing all quality issues for all of Final Body Join; currently serves as a "safety champion" for all of Wing Body Join); *see also* App. B § 5.

26    [15] *See, e.g.*, Erickson Decl. ¶ 7 (has tactical manager role and runs a crew); *see also* App. B § 5.

     [16] *See, e.g.*, Allanson Decl. ¶ 2; *see also* App. B § 5.

Unsurprisingly, there are some DAKU-Ks (particularly newly promoted ones) who are not ready to assume the full range of expected responsibilities, and others who have gravitated to 3rd shift (where it is easier to "hide out") to avoid these expectations.[17]

### d. Potential Class Members Perform Supervisory Duties Differently

DAKU-Ks are not "working" managers. They do not perform production work on airplanes, which falls under the IAM's jurisdiction. 2nd Marx Decl. ¶ 5. Instead, DAKU-Ks are responsible for ensuring that their crew meets production, schedule, and quality requirements. 2nd Johnson Decl. ¶ 14; 2nd Eberhardt Decl. Ex. A (Mann Dep. 92:9-18, 195:2-4). All DAKU-Ks who run crews have responsibilities like motivating and holding employees accountable; assigning and prioritizing work; managing leaves and work restrictions; assigning and approving overtime; resolving employee grievances, and so on. 2nd Johnson Decl. ¶ 14; 2nd Sagisi Decl. ¶¶ 6, 14. But, for many reasons, different demands are placed on different DAKU-Ks.

DAKU-Ks supervise widely varying numbers of employees. The overall ratio of non-management employees to managers for 777 Operations is 18:1 (the target is 20:1), including senior managers and executives. 2nd Sagisi Decl. ¶ 9. The ratio of DAKU-Ks to their direct reports is higher. DAKU-Ks typically have 18 to 25 direct reports, but some have smaller, specialized crews. *Id.*; *see also* Willis Decl. ¶ 7 (managed a crew of three IAM mechanics). Others have crews of more than 30. 2nd Sagisi Decl. ¶ 9.

DAKU-Ks in 777 Operations supervise more than 3,400 IAM employees in around 40 IAM jobs, from unskilled entry-level roles to highly skilled technicians. *Id.* ¶ 10. A manager who must hire and train a large crew of unskilled new hires will have a very different experience than a manager of a small, self-starting crew of highly skilled craft workers.[18] Moreover, some DAKU-Ks also supervise salaried employees, and (unlike managers of hourly employees) are

---

[17] Hein Decl. ¶¶ 12, 15 (those "who want to 'hide out' instead of pushing themselves . . . tend to gravitate to third shift"); Berg Decl. ¶ 11 (some "lack the skills, the drive, or the temperament to be a successful manager").

[18] Allanson Decl. ¶ 6 (team requires less oversight because it is experienced and there is a strong lead and stable work); 2nd Devries Decl. ¶ 13 (experience, skill level, tenure, and personalities within crew dictate how much oversight is required); Weideman Decl. ¶¶ 7-8 ("stark difference" in skill level of crews affects how much time he can dedicate to "business side" of the job, such as staffing and planning); *see also* App. B § 23.

responsible for annual completion of interim and final written performance management reviews and salary reviews, as well as performance remedial action plans. 2nd Sagisi Decl. ¶ 11; 2nd Chen Decl. ¶¶ 11, 13. Many other variables affect DAKU-Ks, including:

- *Crew Experience and Skill*. Lower skilled or less experienced crews often require greater oversight with respect to quality, attendance, efficiency, behavior, and other factors, as compared to a crew of highly skilled and experienced craft workers.[19]

- *Problematic Employees*. A small number of employees require disproportionate investments of management time and effort to address conduct or performance problems. Some DAKU-Ks "own" the process of managing difficult employees; others avoid such challenges.[20]

- *Management Aptitude*. Some DAKU-Ks are more willing to hold subordinates accountable. Other DAKU-Ks who came up through the IAM ranks try to remain "buddies" with their crew and are less successful in transitioning to management.[21]

- *Second-Level Management Expectations and Style*. Some second-level managers have hands-off management styles and expect DAKU-Ks to make decisions and solve problems independently, whereas others are more hands-on.[22]

- *Team Leaders*. DAKU-Ks with strong team leaders can delegate some of their routine, day-to-day management responsibilities, allowing them more time to concentrate on projects, personnel matters, long-range planning, and similar tasks.[23]

**E.     Mann's Limited Experience in the 777 Program**

The experience of DAKU-Ks is varied. Mann's experience is not. For his entire career—before, during, and since his stint as a manager—Mann has worked in a single process center: 777 Aft Systems Installation ("SI"), a part of the Final Assembly MBU. 2nd Sagisi Decl. ¶ 16. As an IAM worker, Mann has had one job: Assembler/Installer Electrical Systems B. *Id.* & Ex. A. Mann promoted to DAKU-K in November 2011 and returned to his IAM job in September 2015. *See* Dkt. #40 ¶ 3; 2nd Sagisi Decl. ¶ 16. Since February 2012 (and for the entire class

---

[19] 2nd Johnson Decl. ¶ 17; 2nd Sagisi Decl. ¶ 13; App. B § 23.

[20] *See, e.g.*, 2nd Johnson Decl. ¶ 19; 2nd Sagisi Decl. ¶ 20; Allanson Decl. ¶ 7 ("I regularly have to . . . have tough conversations about how to move forward, get along, and work as a team"); 2nd Miller Decl. ¶5 (depending on the personalities of the crew, a manager may spend more time mediating disputes amongst team members).

[21] *See, e.g.*, 2nd Johnson Decl. ¶ 19; 2nd Sagisi Decl. ¶ 20; 2nd Barker Decl. ¶¶ 4, 8, 16 (noting "wide range of competence" among DAKU-Ks; given promotion-from-within of mechanics with no management experience); Schultz Decl. ¶ 4 (some Level K managers more effective than others); 2nd Eberhardt Decl. Ex. A (Mann Dep. 47:24-48:19) (his 3rd shift predecessor was removed because she did not hold employees accountable).

[22] *See, e.g.*, McGill Decl. ¶ 10 (has had roughly ten Level L managers and their management styles and priorities affect his "day-to-day work as manager"); Brenberger Decl. ¶ 9 (felt micromanaged in Final Body Join and spent more time on status updates compared to Wing Body Join, where he has more freedom); *see also* App. B § 20.

[23] *See, e.g.*, Allanson Decl. ¶ 6 (experienced team with strong lead that requires less oversight); 2nd Hake Decl. ¶¶ 4-5 (highly experienced and self-sufficient crew; exceptional team lead; freeing him to work on business initiatives); Schultz Decl. ¶ 4 (DAKU-Ks with strong crews "spend less time putting out fires").

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 11

03002-2602/92070406.8

period), he only worked 3rd shift, he had the same boss, and he managed the same department: 3rd Shift Aft SI. *Id.*; 2nd Eberhardt Decl. Ex. A (Mann Dep. 42:11-18; 73:4-19; 83:4-14; 164:8-15). Mann's direct reports were almost entirely Labor Grade 4 and 5 assembler/installers. 2nd Sagisi Decl. ¶ 16. Mann was never assigned a department in either "Structures" MBU or in any other Final Assembly process center (such as Final Body Join or Interiors); he never managed most IAM skills; he never managed salaried employees; he has no 2nd shift managerial experience; and his 1st shift management experience is limited to a brief orientation period right after his promotion (and prior to the class period). *Id.*; 2nd Eberhardt Decl. Ex. A (Mann Dep. 23:8-16; 24:25-25:1; 25:9-11; 25:24-26:1; 26:9-12; 28:21-23; 42:11-18).

Of 13 departments in the Aft SI process center, Mann's was the only one on 3rd shift. *Id.* (Mann Dep. 72:9-20); Dkt. #40 ¶ 2. Because he only worked 3rd shift, Mann never attended the regular management meetings for Aft SI, which were held at 2 p.m. (when all of the other Aft SI managers were at work). 2nd Eberhardt Decl. Ex. A (Mann Dep. 92:23-93:9). His experience also differed from others' because he had a stable, experienced crew and his area rarely worked weekend overtime. *Id.* (Mann Dep. 76:4-9; 188:16-24; 212:24-213:7). Mann was asked to interview job applicants, but declined, so he has no hiring experience. *Id.* (Mann Dep. 170:9-13; 171:2-3). He was supposed to conduct formal evaluations of his team leader, but opted to give only informal, oral feedback. *Id.* (Mann Dep. 86:9-25). On 3rd shift, Mann was isolated from and had little interaction with upper management. His second level manager and MBU director encouraged him to move to 1st shift to take on more and different responsibilities; Mann declined, opting to stay on 3rd shift.[24]

### III.   MOTION TO STRIKE

Because the Court denied Mann's First Motion "without prejudice," it denied Boeing's motion to strike parts of Mann's second declaration (Dkt. #43) as moot. Dkt. #49 at 5. Boeing renews its motion to the extent the Court considers that declaration in support of this motion,

---

[24] *See* Dkt. #40 ¶ 5; 2nd Johnson Decl. ¶ 20; 2nd Eberhardt Decl., Ex. A (Mann Dep. 50:19-51:19).

with the passages in question identified in Exhibit B to the Second Eberhardt Declaration.[25]

## IV.   ARGUMENT

### A.   Class Certification Standards

"Rule 23 operates as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *O'Hearn v. Les Schwab Warehouse Ctr., Inc.*, 2014 WL 6654207, at *3 (W.D. Wash. Nov. 24, 2014) (quotation omitted)). Class actions implicate basic due process concerns because they entail litigating the claims of absent class members who did not choose to file suit, did not select class counsel, and will not participate in the litigation. Thus, the Court must undertake a "rigorous analysis" to ensure that Rule 23 prerequisites have been met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). These prerequisites "are not mere pleading standards"; they are "evidentiary thresholds." *O'Hearn*, 2014 WL 6654207, at *3; *see also Dukes*, 564 U.S. at 350 (plaintiff "must affirmatively demonstrate his compliance with the Rule." So Mann must show through evidence, not just allege, that he can meet all Rule 23(a) requirements—i.e., numerosity, commonality, typicality, and adequacy—and at least one Rule 23(b) category. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542-43 (9th Cir. 2013).

### B.   Mann Does Not Attempt to Meet His Class Certification Burden

The Court should reject Mann's new motion out of hand. It need not conduct a full Rule 23 analysis because Mann does not present an even minimally adequate Rule 23 argument. *Perez v. Wells Fargo & Co.*, 2016 WL 4180190, at *3 (N.D. Cal. Aug. 8, 2016) (using preponderance of evidence standard for Rule 23 analysis). Rather, Mann sets out a proposed class definition and asserts that the "law and arguments under [sic] presented in [his] original motion also apply to his revised class definition." Mot. at 2. This is patently insufficient. The First Motion sought certification of a different class. The record ran for hundreds of pages. *See* Dkt. ##24-29, 42-44. It is Mann's burden to present the Court with evidence, not the Court's to rummage through the

---

[25] Mann offers sweeping, unsupported statements about the duties and authority of hundreds of people without any foundation that he has even met them, let alone observed their work extensively enough to be able to support such generalities as, "FLLs all do fundamentally the same thing in their daily job function as I did." *Id.* ¶ 2.

1   record to see whether it supports Mann's assertions.[26] And Mann cannot remedy this deficiency

2   by supplying missing evidence or argument in his reply. Arguments cannot be raised for the first

3   time on reply. *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1171 (W.D. Wash. 2010).

4            Even if the Court does engage in a full Rule 23 analysis, Mann's motion fails.

5   **C.   Mann Has Failed to Propose An Identifiable Class**

6            As a threshold matter, before the Rule 23 requirements are considered, the party seeking

7   class certification must demonstrate the existence of an identifiable and ascertainable class.[27] An

8   appropriate class definition is "precise, objective, and presently ascertainable," *Mazur*, 257

9   F.R.D. at 567 (quotations omitted), and does not "depend on subjective criteria or the merits of

10  the case or require extensive factual inquiry to determine who is a class member," *In re: Copper*

11  *Antitrust Litig.*, 196 F.R.D. 348, 353 (W.D. Wis. 2000) (quotations and citations omitted).

12           Here, Mann proffers a convoluted definition that takes more words to try to articulate

13  who is *not* in the class rather than who *is*. The reason, of course, is that Mann knows trying to

14  certify a class of DAKU-Ks would be futile: The Court has already determined that "[e]ven just

15  among DAKU-K's there are managers with fundamentally different duties." Dkt. #49 at 4. In

16  trying to avoid that problem, Mann created another. Ascertaining the membership of the new

17  proposed class cannot be done on an objective basis, but would instead require many

18  individualized inquiries. *See supra* at 4-6. Consider Brett Allanson. He serves as a staffing focal,

19  has "tactical" and "quality" responsibilities, is an "acting" second-level manager, *and* runs a

20  crew. Allanson Decl. ¶ 2. Or Catherine Oh, who ran a crew while serving as "staffing manager"

21  for Wing Body Join. Oh Decl. ¶ 4. Determining their "principal" supervisory responsibility is not

22

23  ────────────────
    [26] *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (The court need not "scour the record"); *Zackaria v.*
    *Wal-Mart Stores, Inc.*, 2014 WL 11398759, at *2 (C.D. Cal. Feb. 21, 2014) (denying certification and "declin[ing]

24  to embark on an expedition through 1,448 pages" for support for plaintiff's claims); *Madrigal v. Tommy Bahama*
    *Grp., Inc.*, 2011 WL 10511339, at *5 n.2 (C.D. Cal. June 27, 2011) (same).
    [27] *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009); *Sherman v. Yahoo! Inc.*, 2015 WL 5604400,

25  at *7 (S.D. Cal. Sept. 23, 2015) ("Plaintiff's burden is to provide an objective, reliable, and administratively feasible
    method of ascertaining the class."); *Daniel F. v. Blue Shield of California*, 305 F.R.D. 115, 123 (N.D. Cal. 2014)

26  ("Ascertainability requires that the class definition be "definite enough so that it is administratively feasible for the
    court to ascertain whether an individual is a member" by reference to "objective criteria.") (quotation omitted).

easy. Or consider Bill Schultz, who supervises IAM employees on a daily basis, but does not have his own crew. Schultz Decl. ¶ 5.[28] Is he "directly" supervising IAM production workers?

Of course, Mann may well respond that these DAKU-Ks do not fall within the intended class definition, but one could not *determine* that by reference to objective criteria as opposed to a detailed factual analysis—and a subjective weighing of the relative importance—of different elements of their specific assignments. The proposed class is not ascertainable.[29]

**D.    Mann Cannot Establish Rule 23(a)(2) Commonality**

To establish commonality, Mann must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court explained in *Dukes*:

> What matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.

564 U.S. at 350 (citation omitted).[30]

Mann does not offer any purportedly common questions nor does he show that any such questions would provide common *answers* that would resolve this case in one stroke. *Dukes*, 131 S. Ct. at 2551. His "question" must be whether all putative class members are misclassified.[31] But as this Court has noted, "[q]uestions of exemption do not have common answers when there is significant variance in the duties and responsibilities of class members." Dkt. #49 at 4 (citing *O'Hearn*, 2014 WL 6654207, at *13).[32] And as the Court has found, Level K Managers have "a wide variety of responsibilities," which is true "[e]ven just among DAKU-K's." Dkt. #49 at 4.

---

[28] *See also* 2nd Devries Decl. ¶ 2 (facilitates completion of behind-schedule 777 airplanes; has one IAM direct report but *also* "works closely with, and at times will give direction to crews of IAM mechanics").

[29] *Senne v. Kansas City Royals Baseball Corp.*, 2016 WL 3940761, at *34 (N.D. Cal. July 21, 2016) (class defined on the basis of whether an individual performed "work" in a given state was not ascertainable); *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320 (S.D. Ill. 2009) (proposed subclass of buyers who received a warranty "nearly identical" to that received by plaintiff was not unascertainable); *In re Paxil Litig.*, 212 F.R.D. 539, 546 (C.D. Cal. 2003) (same, where class defined as users of a drug who suffered "severe" withdrawal symptoms).

[30] *Wang*, 737 F.3d at 543 (same); *Boucher v. First Am. Title Ins. Co.*, 2012 WL 3023316, at *8 n.5 (W.D. Wash. July 24, 2012) (same).

[31] In his First Motion, Mann also posited a common question of "whether pay practices applied equally to FLLs." Dkt. #26 at 9. The Court rejected that assertion. Dkt. #49 at 4-5.

[32] *Accord Pedroza v. PetSmart, Inc.*, 2013 WL 1490667, at *9 (C.D. Cal. Jan. 28, 2013) (rejecting assertion that uniform classification of putative class members as exempt created commonality).

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 15

03002-2602/92070406.8

These facts have not changed since Mann filed his First Motion. He certainly has failed to show how the evidence the Court found inadequate for his First Motion can nonetheless establish commonality as to his current proposal. By contrast, Boeing presents additional declarations that reinforce and further demonstrate how DAKU-Ks have significantly varying duties and responsibilities based on a number of different factors. Thus, determining whether one DAKU-K is properly classified as exempt will not answer the exemption question for anyone else.

**E.      Individual Issues Predominate Over Any Common Issues Under Rule 23(b)(3)**

A class may be certified if common questions of law or fact "predominate over any questions affecting only individual members." FRCP 23(b)(3). "Although related to Rule 23(a)'s commonality requirement, the predominance inquiry is far more demanding." *Achziger v. IDS Prop. Cas. Ins. Co.*, 2016 WL 1276048, at *5 (W.D. Wash. Apr. 1, 2016) (quotation omitted). The mere fact that employees are classified as exempt does not establish predominance. *Wang*, 737 F.3d at 545-46. The predominance inquiry focuses on "the relationship between the common and individual issues and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009). Mann cannot establish predominance if "the success or failure of every class member's claim depends on individualized proof." *Boucher*, 2012 WL 3023316, at *4. It does.

**1.      Washington's White Collar Exemptions Require a Fact-Intensive Analysis**

The law governing Mann's claim drives the need for individualized analysis. Under the state Minimum Wage Act ("MWA"), an employee must be treated as "non-exempt" unless he or she qualifies for an "exemption." This case concerns the "executive" and "administrative" exemptions. An employee who performs more than one type of exempt work can be exempt under a "combination" exemption. *See* 29 C.F.R. § 541.708 ("[W]ork that is exempt" for one reason "will not defeat the exemption" for another). The state Department of Labor & Industries ("L&I") emphasizes that the exemption analysis is fact-intensive: "Application of" an exemption "will be on a case-by-case basis depending on the relevant facts." *See* Appendix A, Ex. A.

### a.    The Executive Exemption

Under the MWA, employees engaged in "executive" (i.e., managerial) work are exempt from overtime provisions. RCW 49.46.010(5)(c). An employee is exempt if he or she (1) earns a salary of at least $250 per week; (2) has the primary duty of managing a department (or subdivision thereof); and (3) regularly directs the work of two or more employees. *Elliott v. Custom Apple Packers, Inc.*, 153 Wn. App. 296, 303 (2009) (citing WAC 296-128-510(6)).

Mann conceded that *all* potential class members in his first proposed class (and thus the current one) meet the first "salary basis" test. Dkt. #26 at 14. He also concedes the third element. (His new class is defined to encompass only those who "directly supervis[e] IAM members.") Mot. at 2. Thus, only the second test is in dispute; whether their "primary duty" is management.

An employee's "primary duty" turns on the "facts of [the] particular case" and his or her actual responsibilities, job functions, and activities. Appendix A, Ex. B (L&I administrative guidance regarding executive exemption). The factfinder evaluates an employee's "principal value to the employer" to determine "the relative importance of the managerial duties compared to the nonexempt duties." *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001). "Management" is a broad and flexible concept, encompassing a wide spectrum of supervisory activities manifesting "the exercise of control, direction and authority over the workflow and/or work force."[33] Appendix A, Ex. B, ¶ 6. The following are non-exclusive examples:

> Interviewing, selecting, and training of employees; setting and adjusting . . . hours of work; directing their work; . . . appraising their productivity and efficiency . . . ; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used . . . ; controlling the flow and distribution of materials or merchandise and supplies; providing for . . . safety.

*Id.*; *see also* 29 C.F.R. § 541.102 (examples under federal law). Work "directly and closely related" to the performance of exempt work is also exempt work. 29 C.F.R. §§ 541.702, 541.703.

---

[33] The MWA's definitions substantially parallel their federal counterparts under the Fair Labor Standards Act ("FLSA"), *Jones v. Rabanco, Ltd.*, 439 F. Supp. 2d 1149, 1167 (W.D. Wash. 2006), and cases interpreting the FLSA are persuasive authority in Washington. *Tift v. Prof'l Nursing Servs., Inc.*, 76 Wn. App. 577, 583 (1995).

### b.      The Administrative Exemption

The administrative exemption covers employees who earns a salary of at least $250 per week and whose "primary duty consists of the performance of office or nonmanual work directly related to management policies or general business operations" and whose "duties include work requiring the exercise of discretion and independent judgment."[34] *Reed v. City of Asotin*, 917 F. Supp. 2d 1156, 1161 (E.D. Wash. 2013); *see also* Appendix A, Ex. C (L&I administrative guidance regarding administrative exemption). Examples of "administrative" work include "advising the management, planning, negotiating, representing the company" and "business research." Appendix A, Ex. C ¶ 9; *see also Reed*, 917 F. Supp. 2d at 1162-63.

### 2.      Individual Issues Predominate as to Whether a Given DAKU-K's Primary Duty Was Managerial, Administrative, or a Combination of the Two

At the outset, individual issues predominate because different exemptions apply to different DAKU-Ks. Depending on the specific person and assignment, DAKU-Ks may be exempt under the executive exemption alone or in "combination" with the administrative exemption. Some DAKU-Ks focus a department's day-to-day management. *See* App. B § 6. Some have a significant mix of executive and administrative duties, such as running a crew while leading other projects and initiatives. *See id.* § 5. Their work qualifies under a combination exemption. And some may be subject to different exemptions at different times during the class period.[35] Whether the managerial responsibilities of a DAKU-K who focuses on running a crew meets the executive exemption tells us nothing about whether another who has significant administrative responsibilities is properly classified under a combination exemption (and vice versa). The same is true across the class as a whole. This dooms the motion at the start.[36]

---

[34] "[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." *Id.* ¶ 10. The phrase does not imply or require "unlimited authority and a complete absence of review." *Id.* ¶ 10.3.

[35] Indeed, the same person might float in and out of the class depending on her assignment at a given time. *See, e.g.* Le Decl. ¶ 3 (at times has run a department supervising a crew of IAM workers and at times has not).

[36] *See, e.g., Hendricks v. Total Quality Logistics, LLC*, 292 F.R.D. 529, 541 (S.D. Ohio 2013); *Trawinski v. KPMG LLP*, 2012 WL 6758059, at *6 (S.D.N.Y. Dec. 21, 2012).

### 3.   Potential Class Members Have Different Duties and Responsibilities

Even setting this threshold issue aside, DAKU-Ks' duties and responsibilities are driven by factors that vary from day-to-day, assignment-to-assignment, and person-to-person, and thus determining whether a given manager is exempt simply cannot be done on a classwide basis.

Just as the Court found before (Dkt. #49 at 4), the declarations here reveal material variation in DAKU-K duties and responsibilities. DAKU-Ks supervise different sized crews performing different jobs, take on different roles and responsibilities, and address and manage different problems and issues with varying frequency based on the unique challenges posed by their specific scope of work and shift.[37] Mann, on the other hand, presents no evidence that common issues predominate. Even if the Court scours the record from the First Motion, it does not establish predominance. That motion was supported only by Mann's testimony, based on his limited experience working in a single department of a single MBU and only on 3rd shift. Mann's lack of knowledge about other DAKU-Ks' jobs is palpable. Dkt. #43 ¶ 2 (expressing "surprise" about other DAKU-Ks' responsibilities).[38] To the extent it is even admissible, *see supra* at 12, his testimony just highlights the issues that render certification inappropriate. Declarants describe duties and responsibilities that Mann claims he did not perform, for example:

- Some DAKU-Ks testify that they can authorize and require overtime without consulting a second-level manager. App. B § 3. Mann says that he "had to get approval from a PCL to require employees to do so" (if no one volunteered to work overtime). Dkt. #43 ¶ 19.

- Some DAKU-Ks testify that they can and have hired employees. App. B § 1. Mann testified that he had never had any involvement in hiring (although he had the "opportunity" to do so and chose not to). Eberhardt Decl., Ex. A (Mann Dep. 170:12-171:3).[39]

---

[37] *See, e.g.*, 2nd Johnson Decl. ¶¶ 17-18; *see also* App. B §§ 3, 5, 7-8, 11, 15-16, 19, 22-23.

[38] *See, e.g.*, *Bennett v. Nucor Corp.*, 656 F.3d 802, 816 (8th Cir. 2011) (plaintiffs "worked exclusively" in one department "so their observations do little to advance a claim of commonality across the entire plant"); *Perry v. U.S. Bank*, 2001 WL 34920473, at *5 (N.D. Cal. Oct. 16, 2001) (same, where plaintiff described his own duties); *Young v. Dollar Tree Stores, Inc.*, 2012 WL 3704997, at *3-5 (D. Colo. Aug. 24, 2012) (same); *Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 905 (C.D. Cal. 2009) (same). Nor could Mann cure this evidentiary deficiency by offering hearsay from his counsel purporting to sum up conversations with unidentified "Level K employees," Dkt. #28 ¶ 4, which is inadmissible and provides no basis for certification. *See, e.g.*, *Sanft v. Winnebago Indus., Inc.*, 216 F.R.D. 453, 459 (N.D. Iowa 2003) (denying motion to amend class certification order where plaintiff's counsel submitted a declaration regarding hearsay conversations with unnamed class members).

[39] Even if a manager does not make a final hiring decision, the mere act of *interviewing* candidates is exempt management work. *See* App. A, Ex. B, ¶ 6 ("Exempt work" includes "[i]nterviewing . . . of employees").

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 19

- Mann claims that "it is categorically not true" that DAKU-Ks have "the authority to terminate employees" (Dkt. #43 ¶ 14); some DAKU-Ks testify that they have been responsible for making the decision to terminate an employee. *See* App. B § 2.

- Mann claims that DAKU-Ks "are not involved in handling grievances" after "a formal grievance is filed (Dkt. #43 ¶ 23), but DAKU-Ks can be (and many have been) heavily "involved" in addressing grievances in later steps of the process. 2nd Marx Decl. ¶¶ 11-13.

- Mann claims that a "statement of work" cannot be altered without advance direction by an industrial engineer (Dkt. #43 ¶ 7); other DAKU-Ks testify to making changes when necessary and then talking to Industrial Engineering after the fact.[40]

- Mann suggests that the only authority a DAKU-K has for planning business objectives is to sit on committees and that the only "authority" this bestows is the authority "to attend the committee meetings." Dkt. #43 ¶ 21. Other DAKU-Ks contradict that dismissive testimony. *See* App. B §§ 14, 19. (It is unsurprising that Mann does not know what happens during such meetings, as many take place on 1st shift when Mann was n).

- Mann claims that FLLs do not train employees because all they can do is "*identify* deficiencies in employee performance" and then send employees "to the Boeing training facilities for further training." Dkt. #43 at 11. But many DAKU-Ks testify that they *personally* train employees—both strong employees who they are grooming for advancement and struggling employees who require more hands-on guidance. *See* App. B § 4.

The same point manifests in the strikingly different way that Mann has described his job from many other declarants. For example, Kyle Miller, a DAKU-K in Aft SI, describes spending his day "identifying problems, brainstorming solutions and implementing those solutions." 2nd Miller Decl. ¶ 14; *see also id.* ¶¶ 10-22.[41] By contrast, Mann (who also worked in SI) claims to have had "virtually no involvement in deciding anything that happens throughout [his] day." Dkt. #29-1, ¶ 24. The record shows that Mann resisted his management's requests that he move to 1st shift for greater responsibilities and opportunities (*supra* at 11-12), consistent with DAKU-Ks who prefer to "hide" on 3rd shift to avoid such responsibilities. *E.g.* Hein Decl. ¶¶ 12, 15.

If Miller is properly classified as exempt, does that mean Mann is also exempt? If Mann was "misclassified," is that true for Miller? The analysis of one manager's exemption status tells us nothing about another's. It is not possible to determine how a manager spends his or her time and what authority he or she exercises without individualized, fact-specific testimony.

---

[40] *See e.g.*, 2nd Barker Decl. ¶¶ 15, 24 (a DAKU-K may direct Industrial Engineering (IE) to change the bar chart and, as a DAKU-K, he made changes to the bar chart without pre-approval from IE); Butner Decl. ¶ 6 (DAKU-Ks are responsible for adjusting the bar chart and can override IE); *see also* App. B § 7.

[41] *See also* 2nd Chen Decl. ¶ 11 (describing supervision of cross-functional "support cell" consisting of engineering personnel, quality investigators, "pit bosses," and manufacturing representatives).

Further, of course, the factfinder need not simply accept Mann's testimony (or any other manager's) at face value. Rather (assuming he could survive summary judgment), Boeing would be entitled to challenge Mann's efforts to downplay his responsibilities through cross-examination and affirmative evidence at trial. For example, Mann has disavowed authority to discipline employees, and yet he imposed "documented oral" warnings, written warnings, and unpaid suspensions—and even fired employees. 2nd Sagisi Decl. ¶ 25 & Ex. B. His own emails show that he took an active role in initiating and determining discipline. *Id.* & Ex. C. Boeing is entitled to rely on the actual discipline records and testimony from those involved to show that, in fact, Mann exercised managerial authority in these and other areas.[42] Trying Mann's own claim would require several days and involve multiple witnesses and documents, and this time-consuming endeavor would tell us nothing about any other manager's exemption status.

Not only is this true from person-to-person, it is true as to *each* person depending on their assignment at a given time. Some worked exclusively on special projects during some periods of the class period and primarily managed crews for others.[43] Some ran crews while taking a broader role in the organization, such as a staffing focal role, during some but not all of the class period. *See, e.g.*, Oh Decl. ¶ 3. Determining the applicability of a given exemption to a given employee—and, in some cases, whether a person even falls within the putative class definition—would require a role-by-role (and sometimes week-by-week or month-by-month) analysis.

Thus, the fatal flaw in Mann's new proposed class is the same one that befell the first one. In its defense on the merits, Boeing must establish an exemption's applicability. Its defense to individual claims turns on individualized evidence, so Boeing is entitled as a matter of due process to present such evidence. This is incompatible with the maintenance of this case as a

---

[42] *See, e.g.*, 2nd Eberhardt Decl., Ex. A (Mann Dep. 49:8-50:12) (When assigned to 3rd shift, Mann's boss asked him to "[k]ill complacency," to "assure that the team understands what the company's expectations are," and to "enforce corrective action when policies are broken," and Mann did so); *id.* at 98:9-20, 107:10-108:1, 215:5-22 (admitting that continually driving process improvements was an important part of his job as manager, that he had the authority to assign involuntary overtime and did so regularly, and that he developed and implemented a cross-training plan and assigned an employee to an "overbar," which were "independent" management decisions).

[43] *See, e.g.*, 2nd Devries Decl. ¶¶ 2-3; 2nd Logan Decl. ¶¶ 2-8; 2nd Jacobs Decl. ¶¶ 2-3, 6, 17.

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-1507 RSL) – 21
03002-2602/92070406.8

1  class action. For this reason, courts routinely reject class certification under the circumstances

2  presented here.[44] The Court should deny Mann's motion because individual issues predominate.

### 4.   Any Attempted "Common Policy" Argument Would Fail

4         In his First Motion, Mann suggested vaguely that his own allegedly "representative"

5  testimony would "be supported" by certain policy documents. Dkt. #26. His reply seemingly

6  abandoned that assertion, in the face of Boeing's opposition, as he did not argue (or identify) any

7  "common policy" that could produce a common answer as to whether each class member was

8  exempt. *See generally* Dkt. #44. Any newly-raised argument by Mann in reply that the Court can

9  certify a class premised on "common policies" would be both improper and without merit.

10        Mann must do more than show that Boeing has policies and procedures. A company can

11  give detailed guidance to employees without compromising their exempt status. *Donovan v.*

12  *Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982) (managers exercised discretion where

13  company sought "to limit likely mistakes in judgment by issuing detailed guidelines"). And

14  Boeing builds planes, so lives depend on employees meeting rigorous safety/quality standards.

15  Rather, Mann must identify policies producing a common answer as to whether each DAKU-K

16  is exempt. *Marlo*, 639 F.3d at 948 (that managers must "follow certain procedures or perform

17  certain tasks does not establish" whether their primary duty is management).[45] Nor can Mann

18  obtain certification because 777 operations are complex and have several layers of management:

19  DAKU-Ks remain responsible for managing their own departments and direct reports.[46]

20        Likewise, any attempt by Mann to rely on the DAKU-K job description would also fail: It

21  clearly describes an exempt position and so it could *not* serve as a source of common proof that

22  ─────────────

       [44] *Delodder v. Aerotek Inc.*, 471 F. App'x 804, 806 (9th Cir. 2012) (evidence "showed variations" in duties,
23  authority, "and relationship with supervisors"); *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011)
    (evidence of "centralized control, and uniform policies and procedures" did not establish predominance); *O'Hearn*,
24  2014 WL 6654207, at *10 (same, given variation in managers' testimony); *Weston v. Emerald City Pizza LLC*, 137
    Wn. App. 164, 173 (2007) (no evidence that all managers mostly performed non-exempt work).

25        [45] *See also O'Hearn*, 2014 WL 6654207, at *5 (rejecting reliance on operations manuals and training
    materials, because they did not show "that Assistant Managers performed predominantly non-managerial work");
26  *Rea v. Michaels Stores, Inc.*, 2014 WL 1921754, at *4 (C.D. Cal. May 8, 2014) ("common policies" did not obviate
    "the need for individual inquiry"); *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 252 (N.D. Cal. 2012) (same).
       [46] *See, e.g.*, 2nd Chen Decl. ¶ 3; 2nd Miller Decl. ¶ 4.

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 22

employees are *not* exempt. *O'Hearn*, 2014 WL 6654207, at *5. More broadly, Mann cannot argue that the "common" job description does not describe reality but other (unidentified) documents affect every DAKU-K in exactly the same way. A plaintiff "cannot tout the difference between policy and reality as the basis of [his] lawsuit and then insist that policy invariably reflects reality when it suits [him]." *Ginsburg v. Comcast Cable Commc'ns Mgmt. LLC*, 2013 WL 5441598, at *1 (W.D. Wash. Sept. 24, 2013).

## F.    Mann Also Cannot Establish Other Rule 23(a) Prerequisites

The Court need not conduct a full Rule 23 analysis to deny the motion, but it also fails on other Rule 23(a) grounds. Most notably, Mann cannot establish typicality. Given the diversity of their roles, responsibilities, and duties, there is no such thing as a "typical" DAKU-K. And given that Mann's experience was limited to managing a 3rd shift department and crew, his claim will turn primarily on the executive exemption. Even assuming that Mann is "typical" of the few DAKU-Ks who have managed 3rd shift Aft SI (or even 3rd shift or SI more generally), his experience is distinct from that of managers of other shifts and departments, his stubborn resistance to changing shifts was unusual, and he has little in common with those for whom other responsibilities were a significant part of their duties. *E.g.*, *Till v. Saks Inc.*, 2013 WL 5755671, at *6 (N.D. Cal. Sept. 30, 2013) (plaintiffs not "typical" where "their evidence shows, at most, that their experiences are typical of only some of the proposed class members").[47]

## G.    A Class Action Is Not "Superior"

Finally, Mann cannot show that the case is manageable as a class action or that a class action is "superior." FRCP 23(b)(3); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (a class action is not "superior" where each class member must "litigate

---

[47] Boeing also submits that Mann's "going through the motions" motion does not meet his Rule 23(a)(4) burden of establishing "adequacy." *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Courts have found adequacy unestablished in similar circumstances. *E.g.*, *Richey v. Matanuska-Susitna Borough*, 2015 WL 1542546, at *7 (D. Alaska Apr. 7, 2015) ("Based on plaintiffs' failure to respond to many . . . arguments, their failure to propose a cogent class definition, and their failure to demonstrate compliance with [Rule 23] requirements in two consecutive . . . motions"); *Wynn v. N.Y.C. Hous. Auth.*, 314 F.R.D. 122, 129 (S.D.N.Y. 2016) ("[I]nability to provide a consistent definition for the class"); *Buckland v. Maxim Healthcare Servs., Inc.*, 2012 WL 3705263, at *7 (C.D. Cal. Aug. 27, 2012) ("Based on the briefing and lack of evidence submitted").

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 23
03002-2602/92070406.8

numerous and substantial separate issues to establish his or her right to recover individually").

It is telling that rather than even attempt to offer a trial plan, Mann asks the Court to certify now and determine whether the case should be maintained as a class action later. Mot. at 2 (assuring Court it can "revisit certification at a later time"). But, again, "[a] party seeking class certification must *affirmatively* demonstrate his compliance with the Rule." *Dukes*, 564 U.S. at 350 (emphasis added). Mann continues to assume that "representative" testimony and a few documents could be used to establish an exemption's applicability because experiences are uniform. That was not what the record on Mann's First Motion showed, nor what it shows now.

As a result, there would be two equally unpalatable ways to try this case as a class action. First, the Court could hold scores of mini-trials, which would be unmanageable. Alternatively, it could try the case using generalized evidence, which would necessitate placing arbitrary limits on Boeing's ability to present relevant evidence disproving liability as to any particular DAKU-K. That is, the case could be certified only on the premise that Boeing "will not be entitled to litigate its" exemption "defenses to individual claims." *Dukes*, 564 U.S. at 367.[48]

## V.   THE COURT SHOULD DENY MANN'S SECOND MOTION WITH PREJUDICE

Finally, the Court should deny Mann's motion "with prejudice." The Court gave Mann another chance to set out a proposed class definition and to present any and all support. He responded by filing a two page motion whose only substantive argument is that the Court should allow him to keep redefining the class to see if he can "get it right." That is not an appropriate use of this Court's resources and would create substantial and unnecessary burden for Boeing.[49]

## VI.   CONCLUSION

The Court should deny Mann's motion, this time with prejudice.

---

[48] *See also Blough v. Shea Homes, Inc.*, 2014 WL 3694231, at *16 (W.D. Wash. July 23, 2014) (class action not superior where trial plan would "abridge [the defendant's] entitlement to litigate its defenses"); *Lee v. ITT Corp.*, 275 F.R.D. 318, 324 (W.D. Wash. 2011) (same, where plaintiff did not provide "suitable trial plan").

[49] *City of Fairview Heights v. Orbitz, Inc.*, 2008 WL 895650, at *3 (S.D. Ill. Mar. 31, 2008) (refusing to consider newly raised class definition); *Chapman v. First Index, Inc.*, 2014 WL 3511227, at *3 (N.D. Ill. July 16, 2014) (refusing "second bite at the apple" after "initial definition" was unsuccessful), *aff'd*, 796 F.3d 783 (7th Cir. 2015); *see also Warnick v. Dish Network LLC*, 301 F.R.D. 551, 560 (D. Colo. 2014).

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 24
03002-2602/92070406.8

1

2   DATED: October 10, 2016

By: s/ Charles N. Eberhardt
3                                               By: s/ Chelsea Dwyer Petersen
By: s/ Jeffrey A. Hollingsworth
4                                               By: s/ William B. Stafford
By: s/ Emily A. Bushaw
5                                               Charles N. Eberhardt #18019
Chelsea Dwyer Petersen #33787
6                                               Jeffrey A. Hollingsworth #11853
William B. Stafford #39849
7                                               Emily A. Bushaw #41693
8                                               Attorneys for Defendant The Boeing Company
**Perkins Coie LLP**
9                                               1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
10                                              Telephone: 206.359.8000
Facsimile: 206.359.9000
11                                              Email: CEberhardt@perkinscoie.com
CDPetersen@perkinscoie.com
12                                              JHollingsworth@perkinscoie.com
BStafford@perkinscoie.com
13                                              EBushaw@perkinscoie.com

14

15

16

17

18

19

20

21

22

23

24

25

26

BOEING'S OPPOSITION TO SECOND
MOTION FOR CLASS CERTIFICATION
(No. 2:15-CV-01507 RSL) – 25
03002-2602/92070406.8