1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARVIN MANN,

               Plaintiff,

    v.

THE BOEING COMPANY,

               Defendant.

No. 2:15-cv-01507 RSL

DEFENDANT BOEING'S MOTION FOR
SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR:
April 7, 2017

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – i

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     UNDISPUTED FACTS ......................................................................................... 2

        A.      777 Operations ........................................................................................ 2

                1.      The Everett Factory and 777 manufacturing overview.............................. 2

                2.      Final Assembly ................................................................................ 3

                3.      Aft Systems Installation ................................................................... 3

        B.      Mann's Boeing Employment History ......................................................... 4

        C.      The Manufacturing Manager (DAKU) Job.................................................. 5

        D.      Mann's Management Assignment .............................................................. 7

        E.      How Mann Performed the Management Job ................................................. 9

                1.      Mann assigned work and reassigned employees to meet production
                        demands ........................................................................................ 10

                2.      Mann managed employee hours and assigned overtime........................... 11

                3.      Mann managed employee conduct and performance............................... 11

                4.      Mann appraised his crew's productivity and efficiency and
                        assigned training ............................................................................ 13

                5.      Mann interviewed, selected, and evaluated team leaders ....................... 14

                6.      Mann developed safety and process improvements and exercised
                        discretion in responding to process issues on the Factory floor ............... 14

III.    ARGUMENT ..................................................................................................... 15

        A.      Summary Judgment Standard ................................................................. 15

        B.      Mann Was Properly Classified As Exempt Under the Executive
                Exemption ........................................................................................... 16

                1.      Mann concedes that he was paid on a salary basis and regularly
                        directed the work of two or more employees.......................................... 16

                2.      There is no material factual dispute that Mann's primary duty was
                        management of a department ............................................................. 17

                        a.      Mann managed a "department" ................................................ 17

                        b.      Mann's primary duty was management..................................... 19

IV.     CONCLUSION................................................................................................... 24

1

## I.      INTRODUCTION

2      Marvin Mann filed this case as a class action, but the Court denied both of his motions

3  for class certification. Dkt. #49, #70. What remains is a simple single-plaintiff case.

4      Mann is a long-term Boeing employee who spent most of his Boeing career as an hourly

5  production worker. This case concerns a three-year period starting in September 2012 when he

6  worked as a first-line Manufacturing Manager, a salaried and overtime-exempt position. In

7  September 2015, Mann voluntarily returned to his old hourly job and filed this lawsuit. He

8  alleges that he was misclassified as exempt under the Washington Minimum Wage Act

9  ("MWA") and is due overtime for the time he worked as a manager.

10      The facts are not in dispute and the law is clear: Mann was exempt. The question is not

11  close. Indeed, Mann admits that his job met most elements of the "executive" exemption test and

12  admits to *facts* that establish the final element, namely, that his primary duty was management.

13  He nonetheless stubbornly persists in pursuing this case, apparently because he thinks a first-line

14  manager in a large, complex organization like Boeing can *never* be exempt. He is wrong.

15      The Manufacturing Manager job description depicts an exempt position, and Mann

16  performed the job as described. He was responsible for a discrete and critical phase of 777

17  airplane assembly, he supervised a crew of hourly production employees dedicated exclusively

18  to his department and its work statement, and he performed no production work himself. Among

19  other things, he was responsible for managing production deadlines, process improvements, and

20  employee safety, discipline, and development. He was evaluated and compensated based on how

21  effectively he managed his department. And because he supervised the overnight "third shift," he

22  was largely on his own when it came to resolving the myriad managerial issues and decisions

23  that arose on a daily basis.

24      Mann was, by all accounts, good at his job. And that job, as designed by Boeing and

25  carried out by Mann in practice, plainly qualifies as "exempt" under Washington law. The Court

26  should grant Boeing's motion and dismiss Mann's claims.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

## II.      UNDISPUTED FACTS

**A.      777 Operations**

### 1.      The Everett Factory and 777 manufacturing overview

The Court is familiar with 777 program operations from the class certification briefing. *See generally* Dkt. #31 at pp. 2-4; Dkt. #52 at pp. 3-4. Boeing will not belabor the background facts here. Instead, for the Court's convenience, Boeing will provide only a brief overview of those aspects of the 777 program that bear most directly on Mann's individual claims.[1]

Mann worked in the Everett, Washington plant where Boeing builds 777 airplanes (the "Factory"). Eberhardt Decl., Ex. B ¶ 3. The Factory is vast and complex. *Id.* ¶¶ 4-5. Boeing's four largest airplane models are assembled inside the Factory, which operates around-the-clock on three shifts. *Id.* ¶ 16. Construction of 777s begins in back shops, where crews build up the structures that form the plane's fuselage and wings. *Id.* ¶ 6. These structures are transported to a different part of the Factory for painting and processing, then returned for final assembly, done as the plane travels down a moving line through a series of work areas along the Factory floor. *Id.* Thousands of hourly production employees on three shifts attach the wings to the fuselage and join fuselage sections to form the airplane body; install and test engines, landing gear, and flight control systems; install avionics and interior elements; and perform innumerable other jobs to build the airplane. *Id.* ¶¶ 6, 9. The pace is intense and unremitting. During the period in dispute, Boeing built nearly one hundred 777 airplanes in the Factory every year. *Id.* ¶ 4.

Most 777 employees (90%) work on first and second shifts. Declaration of Sheila Sagisi ("Sagisi Decl.") ¶ 10. Third shift is small (only 10% of the total workforce), short (only 6.5 hours), and used primarily for work that cannot be performed safely on first or second shift, such as crane moves of major airplane structures. Eberhardt Decl., Ex. B ¶ 16; Ex. C ¶ 4; Sagisi Decl. ¶ 10. Indeed, many process centers do not have *any* third shift crews. Sagisi Decl. ¶ 10.

---

[1] Boeing incorporates by reference prior declaration testimony submitted in support of its class certification motion, specifically Dkt. ##35-38, 40, 56-59. For the Court's convenience, the most pertinent of these declarations are attached as Exhibits B-D to the Declaration of Charles N. Eberhardt ("Eberhardt Decl.").

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

### 2.    Final Assembly

The 777 Operations organization is split into three manufacturing business units ("MBUs") that are responsible for different parts of the build: Wings, Fuselage, and Final Assembly. Eberhardt Decl., Ex. B ¶ 10. MBUs are large, complex organizations, each with its own director, its own multi-million dollar budget, a dedicated workforce of thousands of employees, and its own finance, human resources, quality, industrial engineering, and materials management support teams. *Id.*

This case concerns part of the Final Assembly MBU. Final Assembly encompasses final body join, systems installation and testing, and a variety of interior and exterior installation and finishing work. *Id.* This work is performed by distinct process centers, each with hundreds of employees and responsible for a defined part of the build. *Id.* These process centers are overseen by second-level managers commonly called process center leaders ("PCL"), who report to the Director of Final Assembly. *Id.*; Sagisi Decl. ¶¶ 8-9. The hourly production workers who actually perform Final Assembly work do not report to PCLs but, rather, to first-line (Level K) Manufacturing Managers, who in turn report to the PCLs. Eberhardt Decl., Ex. B ¶ 10; Sagisi Decl. ¶¶ 8, 12.

### 3.    Aft Systems Installation

Mann worked in the Aft Systems Installation ("Aft SI") process center and reported to Jon Sprague, the PCL for Aft SI. Eberhardt Decl., Ex. C ¶ 3; *id.*, Ex. E (Deposition of Marvin Mann 33:9-16) (hereinafter "Mann Dep."). The Aft SI work statement is varied and complex. It includes, among other jobs, the installation and testing of airplane doors and emergency escape systems, joining the tail to the aft fuselage section, and the installation of horizontal and vertical stabilizers, tail section flight control systems (elevators and rudders), decks, feeder lines, and interior elements. Eberhardt Decl., Ex. C ¶ 1.

At various times, seven to thirteen first-level managers have reported to Sprague. *Id.* ¶ 2; Sagisi Decl. ¶ 8; Mann Dep. 71:14-23 & Eberhardt Decl., Ex. G at 2. Each manages his or her

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   own department, and most have crews of hourly production workers. Eberhardt Decl., Ex. C ¶ 2.

2   Across all three shifts, 270 hourly employees are assigned to these Aft SI departments. *Id.*

3       Sprague works first shift, and all but one of the managers who report to him work first or

4   second shift. *Id.* ¶¶ 2, 6. Aft SI has a single third shift department and crew, run by a single third-

5   shift manager. *Id.* ¶ 2. This department, No. 6027188, is commonly referred to as "third shift Aft

6   SI" or "Aft SI-3." *Id.* ¶ 3; Sagisi Decl. ¶ 11; Mann Dep. 83:5-14 & Eberhardt Decl., Ex. G at 2.[2]

7   **B.   Mann's Boeing Employment History**

8       Mann has worked for Boeing for 17 years. Sagisi Decl. ¶ 3 & Ex. A. He has held two

9   jobs. He was hired as an Assembler/Installer Electrical Systems B (Job No. 30104) and held that

10  job for 13 years. *Id.* ¶ 3. This job (sometimes referred to as "Electrician") is a skilled hourly

11  production worker position in the collective bargaining unit represented by the International

12  Association of Machinists and Aerospace Workers, District Lodge 751 (the "IAM"). *Id.*; Mann

13  Dep. 16:13-16. This is also Mann's current job. Sagisi Decl. ¶ 3; Mann Dep. 13:21-22. As an

14  Electrician in Aft SI, Mann performed "hands-on" production work. Mann Dep. 34:22-35:1.

15      This case concerns Mann's other job: Manufacturing Manager, Level K (DAKU-K). This

16  is a first-level Factory supervisor job. Sagisi Decl. ¶ 3. Mann was promoted to Manufacturing

17  Manager and removed from the IAM bargaining unit effective November 4, 2011. *Id.* He

18  remained a Manufacturing Manager until September 11, 2015, when he voluntarily returned to

19  his former hourly job in the IAM bargaining unit. *Id.*; Mann Dep. 19:3-11; 57:13-16.

20      For a period of time before his promotion, Mann took on additional "team leader"

21  responsibilities while working as an hourly Electrician. Mann Dep. 17:8-10. Team leader

22  assignments are specifically authorized and governed by the collective bargaining agreement

23  between the IAM and Boeing (the "CBA"), and team leaders receive a $2.00 per hour premium.

24      _____

25  [2] Mann has at times taken issue with calling Aft SI-3 a "department," but admits that Boeing's HR system designates Aft SI-3 as "Department 6027188," that his own work history says *his* department when he was a manager, that all employees who reported to him were also assigned to that department, that 6027188 was his

26  (and his direct reports') department "for budget purposes," and that employees reporting to other managers had different department numbers. Eberhardt Decl., Ex. A (RFA 8 & 9); Mann Dep. 73:4-73:19, 74:9-74:17.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Eberhardt Decl., Ex. D ¶ 14. As a team leader, Mann continued to perform hands-on electrical installation work on the airplane while helping his manager coordinate daily workflow. Mann Dep. 35:2-9. Managers may delegate some of their duties and responsibilities to team leaders (such as making daily assignments and documenting daily production), but as a team leader Mann could *not* appraise the work of other employees, impose discipline or corrective action, or make recommendations as to personnel matters, and he could not be held responsible for the quantity or quality of other employees' work, assign overtime, manage attendance, or perform other related management functions. Mann Dep. 110:23-111:6; Eberhardt Decl., Ex. D ¶ 14.

Mann also covered a vacant manager position on a limited, temporary basis for approximately five months before his promotion in November 2011. Sagisi Decl. ¶ 3; Mann Dep. 18:6-8. During this period, Mann remained part of the IAM bargaining unit, received overtime pay in accordance with the CBA, and had limited authority. Sagisi Decl. ¶¶ 3, 13; Eberhardt Decl., Ex. D ¶ 17. In particular, he was not given access to personnel information, had no responsibility for personnel management, and had no authority to discipline employees. Eberhardt Decl., Ex. D ¶ 17; Sagisi Decl. ¶ 13; Mann Dep. 32:4-16. Instead, during this period, Mann's crew was formally assigned to another manager. Eberhardt Decl., Ex. D ¶ 17.

## C.     The Manufacturing Manager (DAKU) Job

The job description for Mann's Manufacturing Manager job has a general description (covering all three levels of the position) and "level guides" specific to his first-level (Level K) role. Sagisi Decl., Ex. B. The general description emphasizes the managerial nature of the job:

> Manages employees performing activities in multiple manufacturing disciplines. Develops and executes business plans, policies and procedures and develops organizational and technical strategies. Acquires resources, provides technical management of suppliers and leads process improvements. Develops and maintains relationships and partnerships with customers, stakeholders, peers, partners and direct reports. Provides oversight and approval of technical approaches, products and processes. Manages, develops and motivates employees.

*Id.* The level guides elaborate on this statement. A Level K Manufacturing Manager:

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 5

03002-2602/92080850.4

- "Directs the daily operations of [a] work unit" of non-management employees and has the "[a]bility to accomplish results through non-management employees."
- "Directly manages non-management employees in daily operations," but is "[a]ctively involved in daily operations only when required to meet schedule or resolve complex problems."
- "Ensures that projects are completed on schedule and within budget" and has "[f]requent contacts with internal personnel and external representatives concerning operations, scheduling or specific phases of projects or contracts."

*Id.* Compensation, training and performance management standards reinforce the essential managerial nature of the Manufacturing Manager job. Compensation is designed to reward—and thus encourage and reinforce—management effectiveness and leadership. Sagisi Decl. ¶ 18. Manufacturing Managers are paid a fixed salary covering all hours worked and do not receive overtime pay. *Id.* ¶ 17. Annual salary increases differ based on assessments of each manager's leadership attributes and management performance. *Id.* ¶ 18. Manufacturing Managers are also eligible for bonus compensation under a Management Incentive Plan. *Id.* ¶ 19. Under this plan, bonus amounts are based on individual performance measured against business goals (relative to peers), leadership attributes (relative to peers), and business performance. *Id.*

Mann was evaluated based on managerial effectiveness (measured against business goals and objectives) and leadership. Mann Dep. 95:12-96:9; Sagisi Decl. ¶ 16 & Exs. H-J. As to business goals and objectives, Boeing assessed, for example, Mann's success in "running a healthy business," improving the efficiency of Boeing's production processes, ensuring safety for his crew, "connecting people," assuring high quality for the work done by his team, and managing costs. *See* Sagisi Decl., Ex. H at 1-2. As to leadership, Boeing assessed, for example, Mann's effectiveness in "motivat[ing] others," "balancing big picture concerns with day-to-day issues," "set[ting] high expectations," "inspir[ing] others," and "deliver[ing] results." *Id.* at 3-4. Mann's performance drove his salary increases and bonus amounts. Mann Dep. 95:12-96:9.

New managers receive extensive training that emphasizes the leadership responsibility and authority inherent in the position. Sagisi Decl. ¶ 27. 777 Operations requires new Level K Manufacturing Managers to complete an eight-week "New Manager Onboarding" training

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

program that covers a wide range of management topics, including disability management, employee discipline, performance management, employees leaves, safety planning and accident investigations, union relations, employee engagement, staffing, timekeeping, attendance, and overtime management. *Id.* ¶ 6 & Ex. C; Mann Dep. 46:14-47:4. In the year-and-a-half following his promotion, Mann received more than 80 hours of management-specific training. Declaration of Jaspreet Hothi ("Hothi Decl.") ¶ 3. This included (in addition to his initial "Onboarding") training on affirmative action compliance, employee drug testing, structured interviews for team leader selection, and a multi-day "First Line Leadership" training program. *Id.* This last training program encompassed topics such as building employee trust, employee development, learning to delegate, leading a multicultural and multi-generational workforce, engaging and retaining employees, and how to give employees candid feedback on performance issues. *Id.*, Ex E.

**D.    Mann's Management Assignment**

Following his promotion, Mann was initially assigned to first shift until he completed his "New Manager Onboarding" training. Sagisi Decl. ¶ 6. He completed this training in February 2012. *Id.*; Hothi Decl. ¶ 3. Effective February 27, 2012, Mann began managing Aft SI's only third shift department and crew (Aft SI-3 or Department 6027188). Sagisi Decl. ¶ 7; Mann Dep. 42:16-18. As such, he was Aft SI's only manager on third shift. *See* Eberhardt Decl., Ex. A (RFA 6);[3] Mann Dep. 72:9-20; Sagisi Decl. ¶ 11. This remained his assignment until he stepped down from management and returned to the IAM bargaining unit in September 2015. Sagisi Decl. ¶ 3; Mann Dep. 19:3-11; 57:13-16.[4]

Mann's assignment on third shift was "managing the 48 section joins and the vertical fin join." Mann Dep. 42:13-15. He and his department were responsible for forming the tail of the airplane by joining the two aft-most fuselage sections, incorporating the horizontal stabilizer as

---

[3] Hereinafter, citations to Plaintiff's responses to Boeing's Requests for Admission, attached as Exhibit A to the Eberhardt Declaration, will be referred to by the applicable Request for Admission number (e.g., "RFA 4").

[4] For part of the time he was assigned to third shift, Mann was classified as a "fourth shift" employee for pay purposes, which triggered a shift-specific premium. Sagisi Decl. ¶ 7. This technical distinction is immaterial for purposes of this motion.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   part of that join, and joining the vertical stabilizer or "fin." Mann Dep. 77:12-79:4, 82:23-83:1;

2   RFA 10; Eberhardt Decl., Ex. C ¶ 2. This work has to take place on third shift because the joins

3   can only be performed when the moving line is shut down and because installation of the vertical

4   fin requires dedicated overhead crane support. Mann Dep. 79:5-21; Eberhardt Decl., Ex. C ¶ 2.

5       Mann had a dedicated crew of hourly mechanics who reported directly to and worked for

6   him every day. Mann Dep. 76:4-9. His core team had very little turnover, but the total number of

7   employees he supervised varied from roughly a dozen to 25 or 30. Mann Dep. 83:20-23. In 2015

8   (his last year as a manager), he consistently supervised at least 25 employees. Sagisi Decl. ¶ 12.

9   Mann selected one employee to serve as Aft SI-3 team lead. Mann Dep. 84:19-21; 85:5-20.

10       Mann's employees were all IAM-represented and held "Assembler Installer" or "Sealer"

11   jobs. Sagisi Decl. ¶ 12, Exs. D-G; Mann Dep. 114:20-23. These jobs all entail hands-on

12   production work. Sagisi Decl. ¶ 12; RFA 14. Mann himself did not perform any manual

13   production work when he was a manager. RFA 15.

14       In addition to managing Aft SI-3, Mann for nine months (September 2014 to July 2015)

15   also managed the hourly employees in the *Forward* Systems Installations process center's third

16   shift department. Sagisi Decl. ¶ 13. Mann assumed this additional responsibility because the

17   manager job for that department was vacant and the temporary manager who was filling in was

18   an IAM bargaining unit employee. *Id.*; Eberhardt Decl., Ex. C ¶ 4; Mann Dep. 42:18-25. During

19   this period, Mann was responsible for personnel management and employee discipline (in

20   Mann's words, "employee issues, HR-type issues") for this department as well as his own

21   department. Sagisi Decl. ¶ 13; Mann Dep. 42:18-25.

22       Because he worked third shift, Mann had no direct oversight and operated independently.

23   His PCL testified that Mann "*had* to make decisions and take action independently because I was

24   home sleeping during his shift." Eberhardt Decl., Ex. C ¶ 6. Mann agreed that he made decisions

25   without getting Sprague's approval on a regular basis. Mann Dep. 180:2-4. Nor was there any

26   other 777 program PCL or Human Resources ("HR") support on third shift. Sagisi Decl. ¶ 10.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

Mann was evaluated based on the performance of his department and crew because, as manager, he was responsible and accountable for his department's performance as to safety, quality, "people," productivity, and on-time delivery. Mann Dep. 90:7-91:5, 92:9-18; Eberhardt Decl., Ex. H. If, for example, his team fell behind, his PCL expected Mann to fix the problem:

> Q:    Jon Sprague doesn't go to your team, he goes to you, right?
> A:    Yes.
> Q:    [B]ecause as far as he's concerned you're in charge, right?
> A:    Yes.

Mann Dep. 189:14-19.

## E.    How Mann Performed the Management Job

Mann considered himself to be a "conscientious and detail-oriented manager" who did a "good job of holding [his] employees accountable." Mann Dep. 175:25-176:8. Mann's self-assessment is fair. As described more fully below, Mann has conceded that he regularly performed managerial duties, and he testified that he performed the job of a Manufacturing Manager as described in the DAKU-K job description "Mostly." Mann Dep. 119:6-9. Mann identified himself as "777 Aft SI Manager" when communicating with others outside Aft SI (*see, e.g.*, Eberhardt Decl. Exs. I at 3, K at 1, L at 1), and he concedes that his job was to *manage* the work, not perform it. Mann Dep. 195:2-4.

As a Manufacturing Manager, Mann was responsible for:

- Ensuring that his crew performed his department's statement of work safely and efficiently, and meeting all production, quality, and schedule requirements;

- Assigning work, tracking production, motivating employees, and ensuring his employees had and kept current on all required training and certifications;

- Enforcing Boeing policies and procedures (including safety and conduct standards), and holding his employees accountable for inefficient and defective work, attendance infractions, and their conduct generally, including by initiating and issuing formal discipline as needed;

- Investigating and solving problems that interfere with production;

- Initiating and leading efforts to assess and improve production processes, safety, and efficiency for his department; and

- Investing in his employees' engagement and career growth.

Eberhardt Decl., Ex. B ¶¶ 14-15. Mann did all of this.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

      **1.**      **Mann assigned work and reassigned employees to meet production demands**

2

As manager of Aft SI-3, Mann was responsible for ensuring that his department's work

3

was completed on schedule without compromising safety or quality. A crucial part of his job was

4

making daily work assignments, adjusting those assignments as needed, and taking any and all

5

actions necessary to remove roadblocks to timely complete the work. Mann Dep. 162:4-10.

6

Mann's daily routine illustrates his role in assigning work. Mann testified that he arrived

7

an hour before the start of his hourly crew's shift to review work that had been done since he had

8

left the previous morning. Mann Dep. 101:6-7. He then evaluated the condition of the airplane

9

assembly, reviewed the statement of work (a composite of many different tasks or jobs) that his

10

crew needed to complete that day to stay on schedule, and decided whether any adjustments

11

needed to be made to finish the work on time. Mann Dep. 101:6-12. Mann reassessed and re-

12

directed work based on myriad factors, including quality defects during assembly, employee

13

absenteeism, defective parts, or crane loads that arrived late and delayed certain jobs. Mann Dep.

14

105:13-25; 106:15-18. Once his crew arrived, Mann held a meeting with his crew to discuss the

15

plan for the day and to assign tasks. Mann Dep. 76:10-19.

16

Mann continually revised this plan and adjusted work assignments as the day progressed.

17

Mann Dep. 162:1-3, 17-23. "Very seldom" did Mann's days go as planned from start to end, and

18

he often had to develop creative solutions to problems. Mann Dep. 105:22-25; 162:24-163:1. For

19

example, Mann testified that if a different team's activity caused a production delay in Mann's

20

shop, it was his job "to figure out a way to get caught up" (Mann Dep. 168:9-13), and how he

21

responded (e.g., who to reassign or which jobs to defer) entailed discretionary decisions that he

22

made. Mann Dep. 168:17-24. Mann sought input from his team leader and other hourly

23

employees on many of these decisions, but he recognized that at the end of the day he—as

24

manager—was accountable for these decisions. Mann Dep. 164:5-7 ("Q. . . . It's not on your

25

team leader. Your team leader can make a recommendation, but it's your decision? A. Yes.").

26

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

### 2.    Mann managed employee hours and assigned overtime

Mann reviewed and approved his hourly employees' daily time records in Boeing's electronic timekeeping system. Mann Dep. 101:24-25; 102:4-6; 192:17-20. Mann verified that each employee had clocked in and out properly and that each employee clocked into a specific job code within the first half hour of the day, which ensured that the time and costs expended for each airplane were tracked. Mann Dep. 102:12-16. If employees made mistakes, Mann made sure that they fixed them. Mann Dep. 193:5-9. Mann's approval or adjustment of his crew's hours drove their pay for each day. Mann Dep. 102:17-19.

Mann also authorized overtime and mandated involuntary overtime if necessary for his crew to finish their work on schedule. Mann Dep. 107:4-6. Mann usually sought volunteers first, but would "designate" involuntary overtime if more employees were needed. Mann Dep. 107:10-19. To keep up with the 777 production rate, Mann had to assign overtime "almost daily." Mann Dep. 107:24-108:1. He could require his employees to work weekend overtime to get back on schedule, but did so rarely because most of his crew did not like working weekends. Mann Dep. 108:6-12, 188:16-24. To maintain morale, Mann opted to minimize weekend overtime by assigning more overtime during the week. Mann Dep. 188:25-189:5.

### 3.    Mann managed employee conduct and performance

Mann was responsible for managing employee behavior, attendance, and performance, and initiating and issuing discipline (usually called "corrective action" at Boeing). Eberhardt Decl., Ex. B ¶ 14; Sagisi Decl. ¶ 15. This ran the gamut—everything from informal feedback and counseling to firing employees. According to Mann, "the toughest" part of his manager job was dealing with attitudes of hourly employees and "pushback," which happened a lot. Mann Dep. 108:17-109:1. He also worked with union stewards when they challenged his decisions, which they did on a regular basis. Mann Dep. 109:11-13, 109:23-110:3.

Mann worked personnel issues aggressively from the very beginning of his management career. Indeed, his PCL at the time (Robert Lemley) asked Mann to move to third shift in

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 11

03002-2602/92080850.4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

February 2012 specifically to address ongoing employee issues that the prior manager had not

addressed. Mann Dep. 47:16-23. Lemley tasked Mann to "improve performance, engagement,

[and] work the people issues" on third shift. Eberhardt Decl., Ex. F. He told Mann to:

> Kill complacency. I do not like what I'm hearing about 3rd shift being on
> computers for hours during their shift, sleeping during work time, and
> milking jobs out to pad OT. This is absolutely not acceptable and you are
> called to assure that the team understands what the Company's expectations
> are and enforce corrective action where policies are being broken.

*Id.* Mann did what Lemley asked of him. Mann Dep. 50:10-12. During the time Mann was a

manager, he imposed at least a half dozen unpaid suspensions (in addition to numerous written

warnings) and fired at least two employees. Sagisi Decl. ¶ 25; *see also* Declaration of Steven

Miller ("Miller Decl.") ¶¶ 3-10 & Exs. A-1 to F-2 (sample of corrective action issued by Mann).

For example, over a roughly two-year period, Mann issued several steps of progressive

corrective action against—and ultimately discharged— a particularly challenging employee for

various performance and misconduct issues. Miller Decl. ¶ 5. This employee routinely insisted

on union representation, so Mann had extensive interactions with several shop stewards along the

way. *Id.* & Exs. A-1 to A-4, A-6 to A-7, and A-9 to A-10. Mann managed the employee

effectively by clearly and consistently communicating, documenting, and enforcing his

expectations. *See id.* & Exs. A-1 to A-10 (records of corrective action, including oral and written

warnings, suspension, and discharge).

Discipline at Boeing is a management responsibility. Sagisi Decl. ¶ 22. HR provides

guidance and advice but does not—and—cannot initiate or determine discipline. *Id.*; *see also id.*

Ex. K at 2 ("Management must take the primary responsibility for administering ECA decisions.

The HR organization must provide guidance, consultation, and information to management in

support of the process.").[5]

---

[5] Of course, managers do not have *unbridled* discretion. Boeing maintains corrective action guidelines to
ensure that management exercises its discretion fairly and consistently. Sagisi Decl. ¶ 24. Also, for IAM-represented
employees, the CBA requires "just cause" for discipline. *Id.*

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 12

03002-2602/92080850.4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   Mann regularly sought and received HR support in addressing employee issues. But the

2   record reflects that, while HR helped Mann navigate Boeing policies and procedures and

3   prepared discipline paperwork, he—as manager—was the one that initiated and issued the

4   corrective action. *See, e.g.*, Miller Decl. ¶¶ 6-7 & Exs. B-1, C-1, D-1 (initiating corrective action

5   for attendance violations); *id.* ¶ 10 & Ex. F-1 (initiating corrective action for failure to report

6   injury). The record also includes a telling example where HR expressly deferred to Mann on

7   discipline. *Id.* ¶ 9 & Ex. E-2 (email from HR confirming that a formal investigation had

8   substantiated misconduct reported by Mann, indicating that a suspension is "usually" the

9   appropriate discipline in the circumstances presented, and stating that "[*a*]*ssuming you support*

10  *the suspension we can discuss the date for the suspension*") (emphasis added).

11      As a manager, Mann also had discretion, when confronted with employee misconduct, to

12  choose whether to pursue formal corrective action or instead to try to address the issue

13  informally. Mann Dep. 168:25-169:11; Sagisi Decl. ¶ 24. On this point, it is notable that Mann

14  enforced attendance more strictly than most of his peers. Eberhardt Decl., Ex. C ¶ 6.

15      **4.    Mann appraised his crew's productivity and efficiency and assigned training**

16      As a Manufacturing Manager, Mann managed, developed, and motivated his employees

17  on a regular basis. Mann Dep. 119:2-5. Among other things, this entailed ensuring that his crew

18  was properly trained. Mann Dep. 197:19-198:7. To this end, Mann assessed employees'

19  performance and assigned training accordingly or developed cross-training plans to build his

20  crew's skills. Mann Dep. 195:14-20, 212:19-23. Mann sometimes developed cross-training plans

21  collectively with the other first-level managers in Aft SI, and at other times he decided

22  unilaterally how to cross-train his crew. Mann Dep. 212:19-23, 213:20-22. For example, Mann

23  identified an area where cross-training would be valuable and built a plan for his crew, which

24  involved assigning one of his employees to an "overbar" position. Mann Dep. 213:8-12, 213:20-

25

26

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

22, 215:5-13; Eberhardt Decl., Ex. I at 2.[6] Mann agreed that this was an independent management decision that he made on his own. Mann Dep. 215:14-22. When he assigned employees to training, Mann also had to reassign their work to other employees and adjust the work plan for the day to account for their absence. Mann Dep. 197:9-17.

In addition to managing performance-related training, Mann trained his crew on new safety requirements and other Boeing policies and procedures, including attendance policies and the 777 Operating Principles. Mann Dep. 196:3-18. Mann also monitored the status of his employees' training certifications to make sure they were up to date. Mann Dep. 197:2-8.

### 5.   Mann interviewed, selected, and evaluated team leaders

As a Manufacturing Manager, Mann interviewed candidates and selected his crew's team leader. Sagisi Decl. ¶ 14; Mann Dep 84:19-21; 85:17-24. The person Mann selected received an additional $2 an hour for the assignment. Mann Dep. 86:2-4. In addition, Mann participated in team leader interviews and selection for other departments. Eberhardt Decl. Exs. O-P; Sagisi Decl. ¶ 14. Mann was also asked to pre-screen resumes and interview and rate applicants for IAM-represented hourly positions—but he declined. Mann Dep. 170:12-13, 171:2-3.

IAM employees generally do not receive formal performance evaluations, but managers are required to evaluate team leaders, which Mann did. Mann Dep. 86:9-25. Mann was also asked to provide feedback on the performance of HR staff assigned to assist him as a manager. Sagisi Decl. ¶ 15. Mann counseled his team leader about his career goals, training, and development, Mann Dep. 86:9-25, and his PCL rated him highly in 2012 for both hiring "and develop[ing]" his team leader. Eberhardt Decl., Ex. C at 7.

### 6.   Mann developed safety and process improvements and exercised discretion in responding to process issues on the Factory floor

An important part of Mann's job was to develop ideas to improve 777 manufacturing processes. Eberhardt Decl., Ex. C ¶ 15; Mann Dep. 97:21-98:20, 117:2-5. One such process-

---

[6] An "overbar" crew member does not have a set "bar chart" or schedule of work to complete for the day and instead backfills for other people or covers for other jobs as needed through the day. Mann Dep. 213:15-19.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    improvement plan that Mann led entailed adding zone carts to improve assemblers' access to

2    fasteners they needed on the production line, which increased efficiency. Mann Dep. 98:21-

3    99:17. Mann routinely developed short-term work-arounds and he helped develop longer-term

4    technical solutions to a wide range of production problems that arose in his department. Mann

5    Dep. 115:14-116:7; *see also, e.g.*, Mann Dep. 204:1-6, 216:11-217:22; 219:13-230:23; Eberhardt

6    Decl., Exs. J-N.

## III.    ARGUMENT

### A.    Summary Judgment Standard

9    The purpose of summary judgment is to avoid unnecessary trials when there is no dispute

10   as to the material facts. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th

11   Cir. 1994). Summary judgment is therefore appropriate when there is no genuine issue as to any

12   material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

13   56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

14   The moving party has the initial burden to prove that no genuine issue of material fact

15   exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once the

16   moving party has carried this initial burden, the burden shifts to the opposing party. *Id.* The party

17   opposing summary judgment must go beyond the pleadings to designate specific facts

18   establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

19   opposing party thus "must do more than simply show that there is some metaphysical doubt as to

20   the material facts." *Matsushita*, 475 U.S. at 586. It must present significant probative evidence

21   tending to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d

22   1551, 1558 (9th Cir. 1991). Bare allegations, speculations, or conclusions, as well as

23   inadmissible evidence or even a "scintilla" of evidence, are insufficient to meet this burden. *See*

24   *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996).

25   Here, the facts are not in dispute and the law is clear. Mann's position as a Manufacturing

26   Manager was properly classified as exempt.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

1

**B.      Mann Was Properly Classified As Exempt Under the Executive Exemption**

2          Mann's Complaint alleges one core claim: Boeing failed to pay him overtime that he was

3   due because he was allegedly misclassified as "exempt" from the MWA. Dkt. #10 ¶ 31.[7] Mann's

4   claim fails because he was properly classified as exempt under the "executive" exemption.[8]

5          Employees engaged in "executive" (i.e., managerial) work are exempt from the MWA's

6   overtime provisions. RCW 49.46.010(5)(c). An employee is exempt if he or she (1) earns a

7   salary of at least $250 per week; (2) has the primary duty of managing a department (or

8   subdivision thereof); and (3) regularly directs the work of two or more employees. WAC

9   296-128-510(6); *Elliott v. Custom Apple Packers, Inc.*, 153 Wn. App. 296, 303 (2009).[9]

10         The motion before the Court presents a narrow question of law—whether Mann's

11  primary duty was management. Because the undisputed material facts clearly show it was, the

12  Court should grant summary judgment and dismiss Mann's claims in their entirety.

13         **1.      Mann concedes that he was paid on a salary basis and regularly directed the
               work of two or more employees**

14         Here, the first and third elements of the test are not in dispute. Mann concedes that he

15  was paid on a salary basis at a salary rate of not less than $250. RFA 3.

16         Mann also concedes that he regularly supervised the work of two or more other

17  employees. Specifically, Mann admits that he "customarily and regularly directed the work of

18  the non-management employees" assigned to his area of responsibility, RFA 16, and that at all

19  times there were more than two non-management, full-time employees assigned to his

20

21

22  ───────────────

23  [7] Mann also pleads two derivative claims: (1) that Boeing violated RCW 49.52 by "willfully" failing to pay
    him overtime, and (2) that it violated WAC 296-126-050 because it did not keep accurate records of his overtime
    hours. *See id.* ¶¶ 31-34. Because these claims are contingent on Mann proving his MWA overtime claim, they
24  should be dismissed upon dismissal of that core claim.
    [8] Boeing maintains that Mann also qualifies as exempt under a combination of the executive and
25  "administrative" exemptions. *See* 29 C.F.R. § 541.708. In interests of simplicity and because Mann clearly qualifies
    as exempt under the executive exemption, this motion does not develop this additional argument.
26  [9] This is the "short" test for exemption. WAC 296-128-510(6) also includes a "long" test, but it is no longer
    used because the salary threshold for the "short" test is so low.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

supervision. RFA 13.[10] At all relevant times during Mann's employment as a Manufacturing

Manager, Mann supervised no fewer than eleven or twelve employees. Mann Dep. 83:20-84:2;

*see also* Sagisi Decl. ¶ 12 (no fewer than fourteen).

### 2. There is no material factual dispute that Mann's primary duty was management of a department

There is also no *material* factual dispute as to the second element—primary duty of

managing a "department (or subdivision thereof)."[11] This aspect of the executive exemption test

can be broken into two components. First, whether Mann managed a "department." Second,

whether Mann's "primary duty" was "management." Neither is in genuine dispute here.

### a. Mann managed a "department"

First, Mann was responsible for managing a "department." For purposes of the executive

exemption a "department" refers to "a unit with permanent status and function," as opposed to a

"a mere collection of workers assigned from time to time to a specific job or series of jobs."

Eberhard Decl., Ex. Q ¶ 7.[12] Stated differently, a "department" is "a recognized unit with a

continuing function." *Id.* For example, if a human resources department has subdivisions for

labor relations, employee benefits, equal employment opportunity, and personnel management,

each of those functions will constitute a department. 29 C.F.R. § 541.103. A person manages a

department if he or she has "as a continuing function the management of a unit with permanent

status or functions performed by the employees in that unit." Eberhard Decl., Ex. Q ¶ 7.

This is not intended to be a complex test, but rather one calling for a commonsense

judgment. Thus, "[i]n most cases, it can be clearly determined whether an individual is in charge

---

[10] Mann also admits that "he supervised non-management employees assigned to work in his area during his shift," RFA 16, and "normally and recurrently provided such direction during the course of the workweek." RFA 18.

[11] This phase is shortened in this motion to "department," which encompasses the parenthetical subdivision.

[12] The administrative guidance from the Washington Department of Labor and Industries attached as Exhibit Q to the Eberhardt Declaration mirrors the applicable federal regulation, 29 C.F.R. § 541.103. More generally, the MWA's definitions substantially parallel their federal counterparts under the Fair Labor Standards Act ("FLSA"), *Jones v. Rabanco, Ltd.*, 439 F. Supp. 2d 1149, 1167 (W.D. Wash. 2006), and cases interpreting the FLSA are persuasive authority in Washington. *Tift v. Prof'l Nursing Servs., Inc.*, 76 Wn. App. 577, 583 (1995).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

of a customarily recognized department or subdivision of a department." *Id.* Hard cases generally involve "supervisors who work outside the employer's establishment, move from place to place, or have different subordinates at different times." *Id.*

Mann has at times taken issue with the characterization of Aft SI-3 as a "department," but he has admitted to facts that settle the issue. Thus, Mann has admitted:

- He managed Aft SI-3 (Mann Dep. 164:8-15), which had a distinct and well-defined statement of work. Mann Dep. 79:2-14.

- The Aft SI organization chart includes "6027188" above his name, and this number referred to his third shift team. Mann Dep. 72:9-17 & Eberhardt Decl., Ex. G at 2.

- His own work history report (Sagisi Decl., Ex. A) says 6027188 is a department (Mann Dep. 73:11-13); Boeing's HR system designates Aft SI-3 as "Department 6027188" (RFA 9); and 6027188 is *his* department for budget purposes. Mann Dep. 73:14-15.

- The same employees worked for Aft SI-3 week after week and month after month. Mann Dep. 76:7-19.

- Every employee who reported to Mann was assigned to 6027188 (Mann Dep. 73:17-19); Boeing's HR system used 6027188 as the designation for his Aft SI-3 team when he was a manager (RFA 8); and every employee who reported to him when he was a manager was part of "Department 6027188" for budget purposes. Mann Dep. 74:9-74:13.

- Aft SI employees who reported to managers other than Mann all had different department numbers. Mann Dep. 74:14-17.

- If what is defined on Mann's work history as Department 6027188 is a department, then he managed a department. Mann Dep. 165:20-23.

Mann's PCL and HR manager also testified that Aft SI-3 was a distinct department (designated Department 6027188) and that Mann managed that department. Eberhardt Decl., Ex. C ¶¶ 2-3; Sagisi Decl. ¶ 11.

Mann managed a defined unit with its own assigned employees, a specific and unique work statement, and a continuing function at Boeing. Aft SI-3 is plainly "a unit with permanent status and function." *See* Eberhardt Decl., Ex. Q ¶ 7. Nothing more is required under the executive exemption. *See, e.g.*, *Ramos v. Baldor Specialty Foods, Inc.*, No. 10 CIV. 6271 RMB,

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

1   2011 WL 2565330, at *7 (S.D.N.Y. June 16, 2011) ("'Crews' or 'shifts' within the structure of a

2   larger organization . . . constitute 'customarily recognized subdivisions' for purposes of the

3   executive exemption.") (collecting cases), *aff'd*, 687 F.3d 554 (2d Cir. 2012).[13]

4        The fact that Mann may not have called Aft SI-3 a "department" is immaterial. The

5   question is not one of nomenclature but, rather, the functionality of the work group in question.

6   For example, construing the FLSA, one court found that the pre-press department in a print shop

7   was a "department" even though "managers and hourly employees had some difficulty in

8   consistently naming and defining the various departments within the company" because the mere

9   "failure to use the same label to describe the pre-press department and its components does not

10  render it nonexistent" where "[b]oth the department itself and the employees who worked within

11  it had established goals and functions necessary to keep the business operating." *Baudin v.*

12  *Courtesy Litho Arts, Inc.*, 24 F. Supp. 2d 887, 892 (N.D. Ill. 1998).

13       Thus, there is no genuine dispute that Aft SI-3 constitutes a "department" within the

14  meaning of the executive exemption.

15              **b.    Mann's primary duty was management**

16       Second, Mann's primary duty was management. Mann admits that he was a manager, that

17  he performed management functions, and that he managed Aft SI-3, but he equivocates on the

18  ultimate question. Equivocation does not create a genuine issue of material fact.

19       "Management" is a broad and flexible term. It includes a wide spectrum of supervisory

20  activities manifesting "the exercise of control, direction and authority over the workflow and/or

21  work force." Eberhardt Decl., Ex. Q ¶ 6. The following are non-exclusive examples:

22  ---

23  [13] *Brown v. Aleris Specification Alloys, Inc.*, No. 3:14-cv-41, 2016 WL 1183207, at *6 (N.D. Ind. Mar. 28, 2016) (ingot line in an alloy factory was "plainly a customarily recognized department," and noting plaintiff's testimony distinguishing the "ingot line" from the "ingot end" and the "molten end," that the plaintiff's job

24  description referred to his "team of workers" and the "requirements of the shift," and that the ingot line "existed as a separately supervised part of the factory for some 30 years under [the plaintiff], and all it did was produce ingots");

25  *Scherer v. Compass Group USA, Inc.*, 340 F. Supp. 2d 942, 950 (W.D. Wis. 2004) (kitchen of campus restaurant was customarily recognized subdivision of the catering department because it was a "functional grouping" and

26  rejecting plaintiff's assertion that defendant needed to show that the kitchen was "a separate and distinct department with functional independence" from the catering department).

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Interviewing, selecting, and training of employees; setting and adjusting . . . hours of work; directing their work; . . . appraising their productivity and efficiency for the purpose of recommending . . . changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used . . . ; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the employees and the property.

*Id.*; *see also* 29 C.F.R. § 541.102 (similar examples under federal law). These are merely *examples* of managerial responsibilities—there is no requirement that a person perform *all* of them to be treated as exempt. *See, e.g.*, *Frey v. Spokane Cnty. Fire Dist. No. 8*, No. CV-05-289-RHW, 2006 WL 2597956, at *6 (E.D. Wash. Sept. 11, 2006) (employee properly classified as exempt where he performed "majority" of managerial functions setting out in federal regulation).

Assessing "primary duty" requires evaluating the employee's "principal value to the employer" to determine "the relative importance of the managerial duties compared to the nonexempt duties." *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) (trailer park managers were exempt even though they spent 90 percent of their time on manual tasks). *Reed v. City of Asotin*, 917 F. Supp. 2d 1156, 1163-64 (E.D. Wash. 2013) (police chief was exempt where his "management-related duties were crucial to the successful management and operation of the Asotin Police Department" even though "his management-related duties did not consume a majority of his time"). In addition, work that is "directly and closely related" to the performance of exempt work is also considered exempt work. 29 C.F.R. §§ 541.702, 541.703.

This is not a typical executive exemption misclassification case. Usually, the plaintiff in such a case claims not to be a real manager because he or she spends most of the day doing "non-exempt" work such as mopping floors, running a cash register, or otherwise working side-by-side with hourly employees. Mann was not a "working manager." He performed *no* production work. RFA 15. Indeed, the IAM could have filed a grievance under the CBA if he tried to perform such "bargaining unit" work. Eberhardt Decl., Ex. C, ¶ 18. In a very real sense, all that was "left" for Mann to do was management. And that is exactly what he did.

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

As set out in detail above, *supra* at 5-15, the essence of Mann's job at Boeing was management. Boeing designed the Manufacturing Manager to be an exempt position. *Supra* at 5-6. It trained Mann to perform an exempt job. *Supra* at 6-7. And he did, in fact, perform an exempt job. On a day-to-day basis, he supervised his crew and assured that his department's statement of work was completed and that Boeing policies and procedures were carried out. *Supra* at 7-14. Mann held underperforming employees accountable, and he developed and rewarded high performers. *Supra* at 11-14. Mann also played the part that every Boeing manager is expected to perform—continuously implementing, recommending, and identifying opportunities for Boeing to improve the efficiency of its processes. *Supra* at 14-15. This is the very model of the way a frontline manager manages. *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) ("supervision of other employees is clearly a management duty," and "[e]nsuring that company policies are carried out constitutes the very essence of supervisory work") (quotation omitted). Indeed, even Mann admits that he "managed third shift aft installation" (Mann Dep. 164:11-15); he "managed" his assigned employees (Mann Dep. 114:20-115:2, 119:2-5); he regularly performed "management functions," which included leading team meetings, auditing equipment and parts for compliance, and overseeing the work of employee on his shift (Mann Dep. 157:12-158:20); and he made "management decisions" (Mann Dep. 215:14-22).

In a recent case similar to this one, the court determined that a production supervisor at a factory was exempt under the FLSA. *Brown*, 2016 WL 1183207, at *1. This supervisor oversaw the work of a team of hourly employees on part of the factory line. Among other things, this supervisor "made sure that his crew was 'doing what they were supposed to be doing' and ensured that ingot production during his shift conformed with an order sheet he received daily from his own supervisors." *Id.* Because he supervised a unionized workforce, his subordinates' "schedule, pay, and eligibility for promotion were largely dictated by a collective bargaining agreement." *Id.* He instead had such responsibilities as approving time off requests, fielding

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

1    employee complaints, answering upper management questions about how his employees were

2    doing, and "administer[ing] progressive discipline." *Id.* at *2. He "was also in charge of making

3    sure that his crew was trained, even if he didn't do it himself, and was responsible for making

4    sure line workers followed the company's safety policies." *Id.* at *5. Given those facts—and

5    even though the supervisor spent up to 50% of his time performing manual labor—the court

6    found that "there's no question that [the supervisor's] primary duty was managing the ingot line,

7    not working on it." *Id.* at *5-6.

8         This all bears more than a passing resemblance to the facts of Mann's employment, with

9    the exception that Mann concededly did not—and could not—perform *any* manual labor. RFA

10   15; Eberhardt Decl., Ex. D ¶ 18. Numerous other cases are in accord. Where a supervisor's most

11   important responsibility is the day-to-day oversight of a team of employees under his or her

12   control, that supervisor is exempt.[14]

13        Mann's training, performance evaluations, and compensation all reinforce the conclusion

14   that management was his "principal value to the employer," and hence his primary duty. Thus,

15   for example, he was trained to delegate simpler tasks to focus on longer-term management

16   objectives. Hothi Decl. Ex. E, at 45-51. He was evaluated based on his leadership and how

17   effectively he managed his department and crew. Sagisi Decl. ¶ 16; Eberhardt Decl., Ex. H. And

18   _____

19        [14] *See, e.g., Frey*, 2006 WL 2597956, at *6 (employee exempt where he had responsibility for training,
     direction of work, handling of complaints and grievances, making recommendations as to discipline, apportioning

20   work among employees, controlling the flow and distribution of equipment and supplies, and providing for safety);
     *Palazzolo-Robinson v. Sharis Mgmt. Corp.*, 68 F. Supp. 2d 1186, 1190–91 (W.D. Wash. 1999) (same, where

21   restaurant assistant manager was responsible for supervising employees, handling customer complaints, and making
     related decisions, even though she spent a significant amount of time performing manual tasks and serving
     customers); *Reeves v. Haggen, Inc.*, No. C93-5354FDB, 1995 WL 389555, at *1 (W.D. Wash. Apr. 28, 1995)

22   (same, where grocery store perishables manager "handled customer complaints, handled storewide emergencies,
     dealt with merchandisers, evaluated managers' performances, dealt with union representatives, reviewed employee

23   schedules, prepared profitability reports, ensured subordinate managers properly exercised their own disciplinary
     powers, hired and trained his managers, oversaw hiring for his own departments, and monitored and controlled labor

24   costs"); *Donovan v. Burger King. Corp.*, 675 F.2d 516, 521 (2d Cir. 1982) (same, where restaurants "could not
     operate successfully unless the managerial functions of Assistant Managers, such as determining amounts of food to

25   be prepared, running cash checks, scheduling employees, keeping track of inventory, and assigning employees to
     particular jobs were not performed."); *see also Crow v. Energy Nw., Inc.*, 121 Wn. App. 1042 (2004) (unpublished

26   opinion cited under GR 14.1: power plant supervisors exempt where they directed day-to-day work of employees,
     even though union contract governed many aspects of subordinates' employment).

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

1    these same management attributes determined his salary increases and incentive pay. Sagisi

2    Decl. ¶¶ 18-19.

3          Nothing Mann is likely to say in opposition to this motion alters the conclusion that he

4    was exempt. Mann may claim that he could not be treated as exempt because he was a "mere"

5    first level manager who operated within the constraints of Boeing policy, his PCL's expectations,

6    and HR's advice and guidance. But the fact that Mann was part of a complex organization in a

7    large company and reported up the chain to higher-level managers is immaterial.

8          Boeing does not contend that Mann had ultimate authority or complete discretion. He

9    could not change 777 engineering requirements, override the overall 777 production schedule,

10   authorize employees to ignore required safety precautions, disregard an employee's medical

11   restrictions, or fire an employee without just cause. Discretion is not, however, a distinct element

12   of the executive exemption test, and the exemption certainly does not demand that a manager

13   have *unbridled* discretion. *See, e.g.*, *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010,

14   1018 (E.D. Mich. 2005) ("[T]he availability of the executive exemption turns upon the

15   performance of 'management' duties, and there is no . . . requirement that these duties entail the

16   exercise of discretion or independent judgment.") (citation omitted). Thus, "a company may

17   restrict managerial flexibility through corporate guidelines without affecting the exempt status of

18   its managers." *Reeves*, 1995 WL 389555, at *2.[15]

19   ─────────────────────

20          [15] *See also Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011) (a company's expectation
     that managers "follow certain procedures or perform certain tasks does not establish" whether their primary duty is
     management); *Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1302 (S.D. Fla. 2006) ("the case law is replete with

21   decisions holding managers . . . to be exempt, notwithstanding . . . their need to obey corporate policies and/or
     follow the orders of their corporate superiors"); *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1082 (E.D.

22   Tex. 2011) ("There is often a hierarchy in any organization wherein supervisors have persons to whom they must
     report, and the fact that an individual does not have final supervisory authority does not take that person out of the

23   realm of being a manager."); *Beauchamp*, 357 F. Supp. 2d at 1017 (production supervisor was exempt even though
     facility in which he worked "was a 'closely controlled environment'" because "it is not enough merely to propagate

24   standards—rather, supervision is necessary so long as a company must rely on human workers to carry out these
     standards"); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867 (N.D. Tex. 2001) (rejecting supervisor's

25   argument that "because he did not have final decision-making or supervisory authority in the operation of the bakery
     department, he does not qualify for the executive exemption" because "[i]f final decision-making authority were the
     test for determining whether a person was an executive or administrative employee, one would rarely, if ever,

26   qualify as such an employee under the regulations"); *Donovan*, 675 F.2d at 521-22 (rejecting efforts to "disparage"

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 23

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    Mann may also suggest that he could not himself be treated as exempt because some 777

2  Operations departments employ hourly employees in a "team lead" capacity to help coordinate

3  the daily workflow. Again, this is immaterial. Delegation of managerial or quasi-managerial

4  responsibilities to an hourly team lead employee does not cause a manager's own performance of

5  those duties to lose its exempt character.[16]

6    In sum, Boeing is at a loss to understand the basis of Mann's continued pursuit of his

7  individual claims. Under well-established law and undisputed facts, Mann plainly qualifies for

8  the executive exemption.

9                        **IV.    CONCLUSION**

10    Boeing has always found Marvin Mann to be a dedicated and conscientious employee. It

11  has no doubt that Mann genuinely believes he is entitled to overtime premium pay. But that

12  belief is not supported by either the law or the facts. Mann was properly classified as exempt

13  under the MWA. The Court should grant Boeing's motion and dismiss Mann's claims.

---

24  managerial responsibilities because Burger King issued "detailed guidelines" to managers: "Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made.").

25  [16] *See, e.g.*, *Barner v. City of Novato*, 17 F.3d 1256 (9th Cir. 1994) (police officers were exempt where they were required to "perform the same duties as [their] subordinates"); *see also Murray v. Stuckey's Inc.*, 939 F.2d 614,

26  618 (8th Cir. 1991) ("It is irrelevant . . . whether the manager delegated some discretionary duties, or whether other employees who reported to the manager were capable of performing part or even all of the manager's duties.").

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

03002-2602/92080850.4

1

2   DATED: March 13, 2017

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

By: s/ Charles N. Eberhardt
By: s/ Chelsea Dwyer Petersen
By: s/ Jeffrey A. Hollingsworth
By: s/ William B. Stafford
By: s/ Emily A. Bushaw
Charles N. Eberhardt #18019
Chelsea Dwyer Petersen #33787
Jeffrey A. Hollingsworth #11853
William B. Stafford #39849
Emily A. Bushaw #41693
Attorneys for Defendant The Boeing Company
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: CEberhardt@perkinscoie.com
CDPetersen@perkinscoie.com
JHollingsworth@perkinscoie.com
BStafford@perkinscoie.com
EBushaw@perkinscoie.com

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 25

03002-2602/92080850.4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

**CERTIFICATE OF SERVICE**

2          On March 13, 2017, I caused to be served upon counsel of record, at the address stated

3   below, via the method of service indicated, a true and correct copy of the foregoing document.

4      Stephen P. Connor                      ☐ By U.S. Mail, First Class
       Anne-Marie E. Sargent                  ☐ By Overnight Mail
5      Connor & Sargent PLLC                  ☐ By Messenger
       999 Third Avenue, Suite 3000           ☐ By Facsimile
6      Seattle, WA 98104                      ☑ By E-Filing
                                              ☐ By Email
7      steve@cslawfirm.net
       aes@cslawfirm.net
8      Attorneys for Plaintiff

9          I certify under penalty of perjury under the laws of the State of Washington that the

10  foregoing is true and correct.

11         DATED this 13th day of March, 2017.

12

13                          By:  _s/ William B. Stafford_____
                                 William B. Stafford, WSBA No. 39849
14                               WStafford@perkinscoie.com
                                 **Perkins Coie LLP**
15                               1201 Third Avenue, Suite 4900
                                 Seattle, WA 98101-3099
16                               Telephone: 206.359.8000
                                 Facsimile: 206.359.9000

17

18

19

20

21

22

23

24

25

26

BOEING'S MOTION FOR SUMMARY
JUDGMENT (No. 2:15-cv-01507 RSL) – 26

03002-2602/92080850.4